(No. 42197.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. ZELMA L. KING, Appellant.

*Opinion filed May 21, 1973.*

FREDERICK F. COHN, of Chicago, for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and EDWARD V. HANRAHAN, State's Attorney, of Chicago (JAMES B. ZAGEL, Assistant Attorney General, and ELMER C. KISSANE and ROBERT C. SAMKO, Assistant State's Attorneys, of counsel), for the People.

MR. JUSTICE SCHAEFER delivered the opinion of the court:

A jury in the circuit court of Cook County found the defendant, Zelma L. King, guilty of three murders, and recommended a death sentence, which was imposed. On this appeal he contends that his procedural rights were violated in numerous respects, and that the judgment must therefore be reversed.

At the time of the killings, in May of 1967, the defendant, who was 25 years old, had recently moved into a second-floor apartment with his aunt, Bettie Smith, and her children. He brought furniture and a refrigerator with him, and he had placed a sign in front of the building offering the furniture and refrigerator for sale. Thomas Higgins came to the apartment in response to the sign and said that he would like to look at the refrigerator. Mrs. Smith, who was in the kitchen at the back of the building, saw the defendant and Higgins go to the basement and return, and then heard Higgins leave through the front door and go downstairs. About five minutes later she heard the defendant talking to Viola Kendall, the owner of the building, at the front door of the apartment. The defendant was explaining to the landlady the difference

between his refrigerator and the one that belonged in the apartment. She testified that she heard the defendant say, "Don't," and then "Don't point it." Then she heard two shots and ran out the back door to the nearby home of her sister, who notified the police. Both Mr. Higgins and Mrs. Kendall were found shot through the head, on the landing outside the front door of Mrs. Smith's apartment.

Vasil Lookanoff lived in a garage next door to Mrs. Kendall's building. He was standing in the alley behind that building when he heard two shots. He then saw the defendant come down the back stairs and shoot Adelle Young at the back door of her first-floor apartment. The defendant disappeared immediately following the shootings, and he was living under an alias when he was arrested in Arizona 10 months later.

The defendant first argues that the judgment must be reversed because the trial court did not conduct a hearing to determine whether he was mentally competent to stand trial.

On his initial court appearance on March 27, 1968, the defendant requested the appointment of an attorney "from the Bar Association." Two such attorneys were appointed and they entered a plea of not guilty at his arraignment on April 11. On May 10, the court entered an order for a psychiatric examination by the Behavior Clinic. On May 28, the report from Dr. Haines of the Behavior Clinic was filed. It described two interviews with the defendant. The diagnosis following the first interview was: "Sociopathic Personality Disturbance. He knows that he is charged with murder, but otherwise refuses to elaborate on his charges. He is able to cooperate with his counsel." The diagnosis written after the second interview was: "Schizoid Personality Makeup. At this time he knows the nature of the charge and is indifferent to any cooperation." On June 5, defense counsel stated to the court: "I have had occasion to call Doctor Haines. And he said that means exactly what it says, that he doesn't know whether this

man can or cannot co-operate with his attorney. He suggested that other psychiatric help be secured. And that an electroencephalogram be ordered." On June 10 the court appointed Dr. Tricou to examine the defendant and ordered that a competency hearing be held. On July 10, defense counsel sought a further continuance to allow Dr. Tricou to complete her examination. The defendant then asked that his lawyers be dismissed. His request was denied. The defendant was strongly opposed to any mental examination, and defense counsel asked the court to cancel its order for a competency hearing. The court denied this motion and then allowed the attorneys to withdraw from the case.

On August 2, Dr. Tricou filed her report, which stated:

> "At the onset of the examination the prisoner stated, in a comprehensive orderly fashion, in what sounded like a prepared speech that he did not wish to be examined. He asked if it were compulsory and I indicated it was, whereupon he sat down and did not say another word.
>
> * * *
>
> Impression: Probable sociopathic personality. He seems to be aware of the nature of the charges against him but truly adequate assessment of his mental status and ability to cooperate cannot be made without further examination."

The second attorney appointed to represent the defendant also moved for cancellation of the competency hearing order. The court denied the motion, asking the attorney to study the matter further. On August 23 the defendant asked for a black lawyer. On October 23 the attorney then representing him was permitted to withdraw and a black lawyer was appointed. On January 14, at the defendant's request, this attorney was permitted to withdraw. The defendant had announced that he was ready for trial and that he could represent himself. He refused to be repre-sented by the public defender. An assistant public defend-

er was appointed to advise him, and on February 3, 1969, the trial commenced.

The defendant's contention with respect to a competency hearing must be denied. He had no prior history of mental illness or disorders, and his refusal to cooperate with the psychiatrists ordered to examine him stemmed from his insistence that he was mentally competent. An examination of the record leaves no doubt as to his ability to cooperate with counsel when he desired to do so.

It is next argued that the trial court erred in failing to hold a hearing upon the defendant's motion for substitution of another judge. That motion came too late. It was not made until after the defendant had appeared before the trial judge at least 11 times. The first day of trial had been spent in examining prospective jurors. At the beginning of the second day the defendant had moved for a continuance to allow him to seek another attorney; the court denied this motion and proceeded with the selection of the jury. The defendant then renewed his motion, and the court put the case over for two days to allow the public defender advising the defendant to familiarize himself with the prosecution's file. On the third day the defendant moved for the appointment of one of two named attorneys to represent him. The court denied this motion. The defendant then moved to dismiss the jury because it had been exposed to prejudicial publicity. After the jurors had been questioned to determine whether they had seen or heard reports of the case, this motion was denied. The defendant then moved to dismiss the jury because it did not fairly represent the community. The court denied this motion. Only then did the defendant present his motion for substitution of another judge. The motion was properly denied.

The defendant contends that the selection of the jury denied him a fair trial. He first directs attention to the fact that when one of the jurors was being questioned by the

court he stated that if he was accepted he would not be a fair and impartial juror. On further questioning he said that he had worked with colored people and was prejudiced in favor of them. The trial judge then excused him. The defendant's position is that this juror should not have been excused for cause without further inquiry. No authority is cited to support the proposition that a trial judge abuses his discretion when he excuses a juror who asserts that he will be unable to render a fair verdict, and the contention is not persuasive. The defendant's objection to the dismissal for cause of another juror, who stated that he did not believe in the death penalty, need not be considered since the death sentence must be set aside for other reasons.

After the jury had been selected, the defendant moved to dismiss it because "(a) The jury is not a cross-section of the general population of Cook County" and "(b) The State systematically excluded and dismissed all Black jurors." The trial judge denied the motion on the ground that it came too late. The first of these grounds, that the venire did not reflect the community, cannot be reviewed here for lack of an adequate record, and in any event it is contradicted by the second ground, which is that the prosecution used peremptory challenges to exclude two black women and one Latin American. The second ground is itself disposed of by *Swain v. Alabama (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824,* and *People v. Butler (1970), 46 Ill.2d 162.*

The grand jury returned a separate indictment for each victim. The prosecution successfully moved for consolidation of the three indictments for trial. The offenses were properly joined (Ill. Rev. Stat. 1967, ch. 38, pars. 111—4(a), 114—7), and the defendant's contention to the contrary is without merit.

The defendant urges that "the identification of defendant by Mr. Lookanoff was the result of a suggestive

identification procedure and constitutionally inadmissible." He complains of the following episode:

> "Q. Now Vasil, did you know a person in May of '67 by the name of Zelma King?
>
> A. Zelma, I only see him but I don't know his name.
>
> Q. Did you know him by his face?
>
> A. By see him, by the face.
>
> Q. Now do you see that person in court today? Do you want to step down Mr. Lookanoff? Take your time.
>
> A. No, I don't see him.
>
> Q. Do you want to look over in the direction of the counsel table?
>
> A. No, I don't see him. He is not here.
>
> Q. How about that gentleman sitting down there?
>
> A. No, that is not him.
>
> Q. That is not him?
>
> A. No.
>
> Q. All right. Would you stand up please, Mr. King. Would you take off your glasses, please?
>
> A. Yes, that is him. That is right, that is right.
>
> Q. Did you ever see Mr. King with glasses on before, sir?
>
> A. No, I never see him with glasses.
>
> Q. Take another look at him.
>
> A. That is him, that is him.
>
> Q. You are positive, sir?
>
> A. Yes, that is positive. He got such black. The other fellow is a little bit lighter.
>
> Q. Get back on the stand, please.
>
> A. This fellow is black."

The identification by the witness Lookanoff was indeed the result of suggestive questioning, but the entire process, suggestive questions and all, took place in the presence of the jurors, who were in a position to determine the weight to be given to the fact that the defendant was wearing glasses in the courtroom, the difficulty of the witness with the English language, and all other attendant circumstances. We do not agree that the identification was inadmissible.

The defendant's contention that "the court improperly admitted evidence obtained in violation of defendant's 4th Amendment constitutional rights" refers to testimony concerning a box for a gun, through which it was established that the defendant had recently bought a gun of the type used in the shootings. In our opinion the circumstances under which the box was found show that there was no violation of the defendant's constitutional rights.

Immediately after the shootings, two police officers responded to a call that a woman had been shot. No one answered the front doorbells, and one officer went around the building and up the back stairs to the second-floor apartment. He walked through to the front of the apartment, and just outside the front door he found two bodies. He went down the front stairs to open the door for his partner and a sergeant who had arrived, and then returned to the second-floor apartment and went into the front bedroom, which was next to the doorway where the bodies were found. This was the defendant's room, and it was there that the officer found the box for the gun. The box was apparently in plain sight, but the officer also testified that during his search he "looked through the drawers to find out who lived in the apartment." The officer then went back through the apartment and down the rear stairs where he discovered the third body just inside the back door of the first-floor apartment.

The officer noted and included in his report the identifying marks upon the box which made it possible to trace the sale of the gun to the defendant. In his conduct we see no violation of any of the defendant's constitutional rights. The officer knew that a woman had been shot, but he did not know who had been shot or who had done the shooting. It was his right and his duty to be where he was, and no constitutional provision required him to disregard what he saw. The unplanned search, in a setting of immediate violence, does not, in our opinion,

suggest either the necessity for a warrant or a violation of the defendant's right to be free from unlawful search and seizure.

The defendant argues that he was denied a fair trial because the court failed to order that the statements of the witnesses be given to the defendant. At the trial the prosecution gave the defendant copies of the grand jury testimony and the pretrial statements of its witnesses. When he complained regarding one statement that "some of it is missing at the bottom," the prosecutors replied that their own copy was no better than that given to the defendant. Nothing further was said about the matter. The trial took place before the adoption of the discovery rules of this court (see Ill. Rev. Stat. 1971, ch. 110A, pars. 411-415), and we see no ground for reversal either in the circumstance described or in the fact that the defendant was not furnished a transcript of the proceedings at the coroner's inquest in advance of trial.

The defendant contends that his right to represent himself was impaired by the court's refusal to supply him with a copy of chapter 38 of the Illinois Revised Statutes, which contains the Illinois Criminal Code and Code of Criminal Procedure. The same page of the transcript which records the defendant's request also records his statement that he had been reading chapter 38, as well as his request for appointment of another bar association attorney to represent him—a request which the court granted. The incident of which the defendant complains occurred more than six months before trial, at a time when there was no reason to believe that he was going to represent himself.

During a recess the defendant requested permission to talk to his mother, which the court refused. *People v. Martin (1967), 84 Ill. App. 2d 117,* on which the defendant relies, is distinguishable. There the trial court prohibited the defendant, who appeared alone, from communicating with anyone during the trial. Although the better course would have been to allow the defendant's

request, the defendant in this case had counsel to advise him, and had other opportunities to talk to his mother, and we see no reason to disturb the judgment because of this occurrence.

The defendant next argues that the trial court denied him adequate time to prepare his *pro se* final argument. Both sides had rested before lunch on Monday, and the defendant asked for an adjournment until the following day. The court did not err in directing that the arguments begin after the noon recess. The evidence and the issues in the case were comparatively simple, and the State had presented only the arresting officer and three life-and-death witnesses on the last morning. The defendant had had the weekend to analyze the prosecution's case and prepare his argument.

The defendant next contends that he "was denied a fair trial where the court improperly emphasized that defendant failed to cross-examine the prosecution's witness." When the witness Lookanoff testified, the defendant waived cross-examination. Later he changed his mind, and the witness was brought back for cross-examination. As soon as he was seated, the witness blurted out spontaneously, "Yes, that's the same guy." The assistant public defender then said: "Excuse me. At this time, Mr. King asks that he have time to go over some notes with me regarding his cross-examination. If we may break for lunch." The court adjourned, and when the jury was brought back the judge said: "Upon the advice of Counsel, after consultation with Counsel for a period of time, the defendant's attorney now states that Mr. King does not wish to conduct the cross-examination." From what it saw and heard, the jury would naturally have deduced what the court told it, and we see no undue emphasis.

The defendant next contends that the court erred by giving Illinois Pattern Instruction—Criminal No. 2.04: "The fact that the defendant did not testify should not be considered by you in any way in arriving at your verdict."

The committee note states, "This instruction should be given *only* at the defendant's request and then, it *must* be given." (*Cf. People v. Greben (1933), 352 Ill. 582, 595;* Ill. Rev. Stat. 1967, ch. 38, par. 155—1.) The challenged instruction was prepared by the prosecution, but at the instruction conference the assistant public defender who was advising the defendant stated that he would have submitted that instruction if the prosecution had not. The defendant argues that he should not be bound by the action of the public defender. The defendant at times accepted the benefit of the public defender's services and at times stated emphatically that the public defender did not represent him. If we assume that the defendant could have overruled the public defender on this issue, he did not attempt to do so, although he participated in the conference. There was no error in giving the instruction.

For the reasons stated, we are of the opinion that the judgment of conviction should be affirmed. With respect to the sentence, however, the Supreme Court of the United States has ruled that a defendant may not be validly sentenced to death under the statutes that govern this case. (*Moore v. Illinois (1972), 408 U.S. 786, 33 L. Ed. 2d 706, 92 S. Ct. 2562; Furman v. Georgia (1972), 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726.*) The cause is therefore remanded to the circuit court of Cook County for the imposition of sentence in accordance with the Unified Code of Corrections (Ill. Rev. Stat., 1972 Supp., ch. 38, par. 1005—1—1 *et seq.*). See *People v. Harvey (1973), 53 Ill.2d 585; People v. Chupich (1973), 53 Ill.2d 572.*

*Affirmed and remanded.*