**Thomas G. DOEPEL, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 9079, 14184.**

District of Columbia Court of Appeals.

Argued May 4, 1979.

Decided Aug. 13, 1981.

Michael J. Madigan, Washington, D. C., with whom Leslie K. Dellon, Washington, D. C., was on the brief in No. 14184; Wayne S. Bishop, Washington, D. C., with whom Robert Milbank, Jr., Dallas, Tex., was on the brief in No. 9079, for appellant.

Genevieve Holm, Asst. U. S. Atty., Washington, D. C., in No. 14184, and William J. O'Malley, Jr., Asst. U. S. Atty., Washington, D. C., in No. 9079, with whom Earl J. Silbert, U. S. Atty., Washington, D. C., at the time the briefs were filed, John A. Terry, John P. Hume and Henry H. Kennedy, Jr., Asst. U. S. Attys., Washington, D. C., were on the briefs, for appellee.

Before KELLY, Associate Judge, REILLY, Chief Judge, Retired, and PAIR, Associate Judge, Retired.

REILLY, Chief Judge, Retired:

This is the second time that this case has been argued in our court. After a three-week trial in 1974 on indictments charging appellant with first-degree murder, felony murder, and rape,[1] a jury found him guilty as charged. He was sentenced to concurrent terms of imprisonment for 20 years to life on the murder counts, and 15 years to life on the rape count, and appealed. After the case was argued, but before any opinion was released, we were informed in a letter by appellant's counsel that the United States Attorney had disclosed to him that a government witness had testified falsely, and that a motion for a new trial had been

---

1. Offenses defined in D.C.Code 1973, §§ 22–2401 and –2801, respectively.

filed in the Superior Court on the ground of newly discovered evidence. Accordingly, we deferred decision to ascertain whether that court was inclined to grant the motion. *See Smith v. Pollin*, 90 U.S.App.D.C. 178, 194 F.2d 349 (1952). The trial court permitted the parties to present testimony on the motion, conducted hearings on four different days, and ultimately denied the motion in a 19-page memorandum order. As the appeals from this order and from the conviction present some overlapping issues and are to some extent interdependent, we dispose of both in this opinion and affirm.

.No. 90779

### (a) Arrest and Confession

The investigation which eventually resulted in the challenged conviction began late one evening when the police received a report that a man who had the key to the apartment of a Mrs. Florence Gillis had found her lying dead on the floor, her body half-naked, and the cord of an electric iron twisted around her neck.[2] A medical examiner, who arrived on the scene about midnight, estimated that death had occurred some three to twelve hours before.

Police learned from neighbors in the apartment building that the victim had been visited by an unidentified repairman in the early afternoon, that he had departed briefly and returned, that subsequently sounds of laughter and conversation emanated from the Gillis apartment, and that at approximately four o'clock, the visitor left the apartment building and drove off in a white panel truck. Detectives eventually traced the stranger to his place of employment, a company which had sold a refrigerator to Mrs. Gillis a few months before her death. They discovered that he—Thomas Doepel, appellant—was one of two repairmen who had made service calls on the day of the murder. They then asked appellant to accompany them to the office of the homicide squad, where he was advised of his rights and told that he was not under arrest.

While an interview was in progress, his questioners were informed that one of appellant's fingerprints matched the print on a beer can taken from the Gillis apartment. Appellant was placed under arrest and again advised of his rights. He requested the police to let him summon his roommate, Gilbert Frazier, a student at Howard University. When the latter appeared, the detectives who were still in the room heard appellant blurt out that he had killed a woman. Frazier asked the police to step out, and the two men were left alone for about 10 or 15 minutes.

After Frazier had gone, the detectives resumed their questioning. Appellant then admitted that he had strangled Mrs. Gillis and gave the detectives an account of his visit to her apartment. What appears to be a verbatim statement was typed, signed by appellant, and ultimately admitted at trial as a voluntary confession after the defense had unsuccessfully moved to suppress it.[3]

According to this document, appellant had met Mrs. Gillis the previous summer through a chance encounter in a restaurant, and had seen her briefly on another occasion. Their acquaintanceship was not an intimate one, and appellant had not even connected her name with the schedule of service visits assigned to him on the particular day, until she opened the door of her apartment and they recognized each other. After fixing the refrigerator, he chatted and drank beer with her. At her suggestion he then went out to replenish her liquor supply, buying six cans of beer and a bottle of rum at a neighborhood store. When he returned they conversed some more, drank for awhile, played a phonograph, and danced. Then they "had sex" and he "choked her." This portion of the statement reads:

> I choked her first with my hand, and then I checked to see if she was still alive, and I got the iron from the dining room table

2. The man who discovered the body, James Flowers, told the police that he had been dating the decedent for about eight years and that they were sexually intimate.

3. The court's denial of the motion is not challenged on appeal.

and wrapped the cord around her neck and choked her some more. She was dead now, so I took a towel from the bathroom and tried to wipe my fingerprints from the door knob, and I wiped the records off and I just threw it down.

After that I just walked down the stairs, and got in the truck and left. I went back to the shop and turned my tickets in and left. This must have been about 5:00 p. m., maybe about 4:30 p. m.

■ The admissibility of this statement into evidence was challenged on a defense motion to suppress. Once that motion had been denied [4] and the statement received, it is apparent that appellant himself supplied sufficient evidence to justify the verdict of guilty on the court's charging him with first-degree murder—a crime defined in D.C.Code 1973, § 22–2401, as killing "another purposely . . . of deliberate and premeditated malice." We refer to his admission that he had not only choked his victim with his hand, but had also made sure that in advance of leaving the premises, she was dead—an objective attained by going to another room, bringing back an electric cord and wrapping it around her neck until he was certain of fatal strangulation.

■ While some appreciable time for reflection is required to demonstrate the element of premeditation, such interval need not be long, if the circumstances reveal that the killing was the product of some deliberation rather than the senseless act of a mind abandoned to "impulse, passion, or frenzy." *Parman v. United States*, 130 U.S. App.D.C. 188, 197–98, 399 F.2d 559, 568–69, *cert. denied*, 393 U.S. 858, 89 S.Ct. 109, 21 L.Ed.2d 126 (1968).

The written confession, however, contained nothing which incriminated appellant of rape or attempted rape. Indeed, appellant's version of events carries the contrary implication, for his description of decedent's hospitality, the extended afternoon of dancing and drinking, plainly suggests that she was not averse to an amorous interlude, including sexual intercourse. In returning a bill of indictment which included charges of rape and felony murder, however, the Grand Jury apparently concluded that the only rational explanation of appellant's homicidal conduct was that his hostess ultimately resisted his sexual advances and consequently her death was necessary to prevent any outcry or complaint to the police.

To sustain these counts of the indictment, the government presented extensive testimony to demonstrate that appellant had resorted to force in accomplishing his sexual purposes. Some of this evidence was gruesome. It included not only photographs, but physical descriptions of the decedent's body, with blood coming from the mouth, and of a liquid substance medically analyzed as sperm or prostate gland secretion in the vagina, anus, and mouth. Also introduced as exhibits were decedent's dentures, pubic hair samples, and appellant's undershorts containing a stain, identified by an expert witness as congealed human blood.

### (b) The Insanity Defense

Having failed at the pretrial hearing to obtain an order suppressing the confession as involuntary, resourceful defense counsel, after the government rested its case, did not call appellant to the stand. Without conceding or denying the charges, appellant relied upon an insanity defense. A Dr. Wedge, a psychiatrist who had interviewed appellant on separate occasions while he was awaiting trial, testified that he had concluded that at the time of the homicide appellant was suffering from pathological intoxication. He described it as a temporary insanity "associated with drinking." Elaborating further, the witness defined "pathological intoxication" as a rare form of mental disorder, likely to manifest itself after drinking even small amounts of alcohol. In this mental state, the person afflicted by such illness engages in acts completely at odds with his normal character and remembers nothing about his aberrant behavior after regaining sobriety.

4. *See* note 3 *supra.*

According to Dr. Wedge, a recurrence of this disorder happened on the fatal afternoon. The witness based his opinion on appellant's account to him of his personal history, which included recollections of headaches, dizzy spells, and lapses of memory, as well as his version of what had transpired during his visit to decedent's apartment.[5] Had the jury accepted the opinion of Dr. Wedge, appellant would have been entitled to an acquittal on the ground that he lacked the mens rea requisite to such intentional crimes as deliberate murder and rape.

To reinforce the psychiatrist's opinion, the defense placed appellant's roommate, Gilbert Frazier, on the stand. He testified that on several occasions he had noticed appellant behaving erratically and aggressively after he had been drinking. He also recalled that appellant had to be taken to a hospital one evening when he seemed to be disoriented. Contradicting the detectives who had testified for the prosecution, the witness denied that appellant had volunteered to him, when in police custody, that he had killed or strangled a woman.

In rebuttal, the government produced three other psychiatrists, who had examined appellant at St. Elizabeths Hospital, where he had been taken for some pathological and psychiatric tests. None of these witnesses was of the opinion that appellant was afflicted with pathological intoxication or any other form of mental illness relevant to the case. By its verdict, the jury apparently believed their diagnosis and rejected Dr. Wedge's view.

Appellant argues that in its rulings and instructions with respect to his insanity defense the trial court committed three major errors, *viz*:

(1) In permitting the government to elicit evidence from a defense witness that appellant had been convicted of rape in another jurisdiction, "a fact the prosecutor knew to be false."

(2) In instructing the jury that appellant had to prove his insanity by a preponderance of the evidence.

(3) In refusing to instruct the jury that it might consider evidence of appellant's impaired mental condition with regard to the charge of first-degree murder to negate the elements of premeditation, deliberation, and specific intent.

The first claim of error relates to one phase of the cross-examination of Dr. Wedge. He had testified that appellant's conduct in his victim's apartment was a striking departure from appellant's normal behavioral pattern. The defense expert explained that from his interviews with appellant, in which the latter had given him his biographical history, he had concluded that appellant was a "relatively gentle nonaggressive person." Drawing the witness' attention to a portion of his notes which he had not read to the jury, the prosecutor requested him to read the partially omitted paragraph, *i. e.*,

> At 19 years of age, he stole a car and was sentenced to one year in Danbury prison. *At 20 years of age he was convicted of assault, two burglaries, and a rape charge in Schenectady, New York, and served five years in Auburn and Sing Sing prisons.* (Italics supplied.)

The witness did so and confirmed that he had gleaned this information "from Mr. Doepel, himself." The prosecutor then put the rhetorical question as to whether the witness still adhered to his testimony that appellant was a gentle person.

Actually, appellant had not been convicted of rape, but had pleaded guilty in the New York case, which resulted in the prison sentence, to two counts of burglary and one count of assault in the second degree. It is vigorously argued that since the prosecutor was aware of this before he cross-examined Dr. Wedge, he was guilty of prosecutorial misconduct in representing to the jury that the accused had already been convicted in another jurisdiction of one of the crimes

---

**5.** The witness said that appellant remembered dancing and having sexual intercourse with the victim, but could not recall anything else until

he discovered she was dead, and then assumed that he had killed her.

charged in the instant case, *viz*, rape. Citing *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), and other holdings condemning the use by prosecution lawyers of testimony known by them to be false, appellant urges that the trial court erred in refusing to grant his motion for mistrial when his objection to the offending testimony was overruled.

■ In our opinion, this argument is based on an exaggerated view of the record, for what the prosecutor elicited from Dr. Wedge in his cross-examination was in fact true—appellant had informed him privately that he had been convicted of rape, but notwithstanding this revelation the defense psychiatrist was willing to characterize the defendant as gentle and non-aggressive. In short, all that the prosecution attempted to do in bringing out the omitted section of what the witness believed was indeed appellant's criminal record, was to demonstrate that the expert in expressing his opinion from the witness box conveniently ignored facts which pointed to a different conclusion. Plainly this was a legitimate mode of impeaching the validity of the expert's diagnosis.

■ To be sure, if no further reference to the New York cases had been made, the jury might well have gathered the impression that the defendant had previously been found guilty of rape. But this is not what happened. After a bench conference with counsel, the trial judge instructed the prosecutor to read a stipulation agreed to by both sides which accurately summarized the record of the New York cases. In his final instructions to the jury, the trial court reminded the jury of the stipulation entered into by counsel to clarify references made by Dr. Wedge and admonished the jurors that the defendant's past record was not evidence of guilt of the offenses charged here; that no inference of guilt should be drawn because of any plea in a prior case.

Appellant contends that this curative instruction came too late and that it was error for the trial court not to have warned the jury as to the limited relevance of the controversial testimony when it was given. The transcript, however, does not show that counsel made any request for such warning when the stipulation was read. Hence there was no reversible error.[6]

■ Appellant's two exceptions to the trial court's instructions cannot be sustained, as these legal issues have been resolved by intervening decisions of this court. In advising the jury that appellant had to prove his insanity by a preponderance of the evidence, the court was merely paraphrasing the last sentence in D.C.Code 1973, § 24–301(j). In two earlier trials, where such a charge was given, this provision of the code was challenged as unconstitutional by defendants whose pleas of insanity had been rejected by juries. In both instances this court upheld as valid the statutory prohibition against acquittals on the ground of insanity unless such insanity "is affirmatively established by a preponderance of the evidence." *Bethea v. United States*, D.C.App., 365 A.2d 64 (1976); *Shanahan v. United States*, D.C.App., 354 A.2d 524 (1976).

■ In assigning as error the court's refusal to instruct the jury that it might consider the evidence of appellant's mental abnormality (*i. e.*, the defense psychiatrist's diagnosis of pathological intoxication as negating the deliberate intent required for first-degree murder) appellant has urged us to recognize the defense of "diminished capacity" as defined in *United States v. Brawner*, 153 U.S.App.D.C. 1, 471 F.2d 969 (1972) (en banc). This court in a well-reasoned opinion, however, has refused to adopt the *Brawner* rule, *Bethea v. United States, supra*, at 70–92. Accordingly, we find no error in the trial court's refusal to accede to the defense request.

(c) The Jury Issues

After the pretrial hearing on the motion to suppress the confession, the defendant

---

6. *Dixon v. United States*, D.C.App., 287 A.2d 89, 98–99 (1972). *See also Johnson v. United States*, D.C.App., 387 A.2d 1084 (1978); *Har-* *ling v. United States*, D.C.App., 382 A.2d 845 (1978).

waived his right to a jury and specifically requested a nonjury trial. Counsel advanced several reasons for fearing that certain aspects of the pending trial might prejudice a jury against his client, citing, *inter alia*, such factors as the defendant's race (he is white, the victim was black), a homosexual relationship between the defendant and Frazier, whom he expected to call as a witness, the prospect of psychiatric testimony, and the likelihood of evidence of prior convictions for other criminal offenses. The government objected, relying on Super. Ct.Cr.R. 23(a), which requires the consent of the prosecuting officer to a jury waiver. The court refused to approve the request, but allowed counsel to participate in extensive *voir dire* as the individual jurors were impanelled.

On appeal, counsel argues vigorously that the denial of appellant's request for a nonjury trial constituted prejudicial error, even though the court below felt that because of Rule 23(a) it had no other choice. A similar rule is in effect in the federal courts and appellant cites a Supreme Court opinion, *Singer v. United States*, 380 U.S. 24, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965), as authority for the proposition that trial judges in some circumstances are not bound by prosecutorial refusal to waive a jury trial.

In *Singer*, a defendant indicted on numerous counts of mail fraud, proposed to waive his right to trial by jury, but—as in the case at bar—the government declined to go along, whereupon the trial judge considered himself bound to impanel a jury. After his conviction, Singer argued that as the Constitution confers only on defendants the right to a jury trial, he was entitled to waive that right notwithstanding government objection under Rule 23(a) of the Federal Rules of Criminal Procedure. The Supreme Court turned down this argument, but in a unanimous opinion written for the court, Chief Justice Warren observed:

> We need not determine in this case whether there might be some circumstances where a defendant's reasons for wanting to be tried by a judge alone are so compelling that the Government's in-

sistence on trial by jury would result in the denial to a defendant of an impartial trial. [380 U.S. at 37, 85 S.Ct. at 791.]

According to appellant, the kind of circumstances to which the Supreme Court adverted in *Singer* were present in his case and were so compelling that the ruling of the trial court prevented his being tried before an impartial body. In his brief, appellant cites a number of opinions of federal appellate and district courts recognizing that there are indeed situations justifying a court's disregard of government insistence upon a jury trial. In none of them, however, was it held that the refusal to grant a nonjury trial was a ground for reversing the particular conviction. *See United States v. Ceja*, 451 F.2d 399 (1st Cir. 1971); *United States v. Farries*, 328 F.Supp. 1034 (M.D.Pa.1971), *aff'd*, 459 F.2d 1057 (3d Cir. 1972), *cert. denied*, 409 U.S. 888, 93 S.Ct. 143, 34 L.Ed.2d 145 (1972); *United States v. Wright*, 491 F.2d 942 (6th Cir. 1974); *United States v. Kramer*, 355 F.2d 891 (7th Cir. 1966), *vacated and remanded on other grounds*, 384 U.S. 100, 86 S.Ct. 1366, 16 L.Ed.2d 396 (1966); *United States v. Harris*, 314 F.Supp. 437 (D.Minn.1970).

▪ It is appellant's point that while the grounds advanced unsuccessfully by some of the defendants for disregarding prosecution insistence upon a jury trial, *e. g.*, racial or religious prejudice, the heinous character of the offenses charged, prior criminal records, contemporary news stories of similar crimes, etc., coincided with some of the reasons given by appellant to support his request, in none of the cited cases was there a combination of the reasons which appellant argues made impossible an impartial trial by jury. We have studied these decisions and agree with appellant that none of these is on all fours with his. Nevertheless, we do not deem the circumstances present in the instant case as so provocative of "passion, prejudice, and public feeling" that fair adjudication of the issues by a jury was beyond the realm of reasonable probability. For one thing, so little pretrial publicity was accorded this case by the press that it was most unlikely that any prospective jury

had formed an opinion prior to trial.[7] Nor was this a case where racial animosity might have caused a jury to ignore or discount a defense of mistaken identity or defense testimony contradicting the version of the facts put forth by government witnesses, for at no stage of the trial did appellant present any evidence to prove that the fatal strangulation or the rape was not committed by him—his only defense being the lack of mental capacity to establish guilt.

■ We are not impressed by the argument that the use of psychiatric testimony or evidence of homosexual conduct by the defendant was bound to inflame a jury composed of "laymen" against him.[8] Judicial notice may be taken that in the vast majority of reported cases, where insanity has been pleaded, defendants have been content to let juries appraise the worth of the opinions of psychiatrists. And in a jurisdiction where the elected legislative body has repealed a law making homosexual intercourse a crime, we can scarcely infer widespread community prejudice against persons of such sexual orientation.

■ The record discloses that the court was aware that some individual members of the jury venire might indeed harbor such prejudices. Consequently, it allowed great latitude to trial counsel in participating in *voir dire* when the jury was being selected. None of the prospective jurors admitted to hostile feelings against homosexuals. When two expressed reservations about the credibility of psychiatrists, or drunkenness as a defense, the court sustained challenges for cause.

In view of this aspect of the record, we do not regard the instant case as of the kind envisaged by the Supreme Court when it spoke of "circumstances . . . so compelling" that an exception to the *Singer* rule was warranted. In reaching this conclusion, we have examined other arguments of the appellant, including his contention that the real motive of the prosecution in objecting to a jury trial was "ignoble," but are not persuaded by them.

■ A more serious criticism of the possible fairness of the trial than the fact that the defense's objection to any jury was overruled was the racial composition of the jury itself. All the jurors who heard the case were black; the defendant was a white man charged with the rape and murder of a black woman. In his brief, appellant charges that the government by exercising its peremptory challenges to remove "a number of white males" from the panel was responsible for the unbalanced racial make-up of the jury eventually seated.

Ever since 1880, when a statute qualifying only white people for jury duty was struck down as unconstitutional, *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 the Supreme Court has repeatedly held that no state or county can exclude from jury service any identifiable part of the community. *Norris v. Alabama*, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935); *Smith v. Texas*, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940). This principle, founded on the equal protection clause of the Fourteenth Amendment, has not been limited to race, but applies to groups identifiable by national origin, *Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954), or sex, *Ballard v. United States*, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946). In more recent years, the Court has extended this doctrine by holding that irrespective of whether a particular defendant is a member

7. The newspaper stories which appellant drew to the trial court's attention in asking for a mistrial dealt with crimes committed by other persons. The contention that such stories, if read by jurors, created "an overall prejudicial atmosphere" borders on the frivolous.

8. Appellant's brief accuses the prosecution of inflammatory and improper conduct in bringing out from the witness Frazier the fact of his homosexual relationship with appellant. But this fact was elicited merely to show possible bias on the part of the witness in denying appellant's purported admission to him during his visit to the police station. The jury had already learned of appellant's homosexuality through the questions of defense counsel on *voir dire*, and the testimony of the defense witness, Dr. Wedge.

of an excluded class, the venire (*i. e.*, the pool of prospective jurors drawn for service at any given term of court for grand jury or petit jury service) should reflect a fair cross-section of the community in order to insure the Sixth Amendment rights of an accused to an impartial jury. *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975); *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972).[9]

In this jurisdiction where, according to census figures, approximately 70% of the population is black, this would mean that the makeup of the pool of prospective petit jurors drawn for any given period of service should reflect the census ratio in order to satisfy the requirements of *Taylor* and the controlling statute. Here, appellant does not contend that the racial composition of the pool from which his jury was drawn failed to mirror the community, but rather that the use of peremptory challenges by the prosecution made the jury which tried him completely unrepresentative.

The line of Supreme Court decisions requiring representative community characteristics, however, have dealt entirely with the jury pool or jury venire, not the composition of any particular petit jury. The Court itself made that distinction clear when it was confronted with the very point (except that the races were reversed) appellant has raised in *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 442 (1964). The record there disclosed that in the process of selecting a jury to try a black defendant indicted for a capital offense, the county prosecutor struck from the panel peremptorily the only six Negroes among the veniremen available. Thus, no one of the defendant's race served on the jury, which eventually returned a guilty verdict. In holding that the very essence of the rights of counsel on both sides to make peremptory challenges eliminated any requirement for justifying their exercise, the Court said:

In the light of the purpose of the peremptory system and the function it

serves in a pluralistic society in connection with the institution of jury trial, we cannot hold that the Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case. The presumption in any particular case must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court. The presumption is not overcome and the prosecutor therefore subjected to examination by allegations that in the case at hand all Negroes were removed from the jury or that they were removed because they were Negroes. Any other result, we think would establish a rule wholly at odds with the preemptory challenge system as we know it. Hence the motion to strike the trial jury was properly denied in this case. [*Id.* at 222, 85 S.Ct. at 837.]

The opinion made only one exception to the rule that peremptory challenges by the prosecutor, irrespective of their impact on the final jury selection, are immune from review. In a case where an appellant made a showing that in the jurisdiction where he was tried, the prosecution had always used peremptory challenges to keep Negroes off juries, the opinion indicated that it might view the situation as demonstrating systematic exclusion of a particular race. The Court emphasized that the burden of proving the existence of such a system, however, was on the defendant.

The *Swain* decision has been criticized by some commentators as making the right to jury pools which are really a cross-section of the community an empty one. Is is argued that the mere presence of fellow members of a minority group on a jury venire affords little or no protection against racial or religious prejudice to a defendant, if none of his fellows is seated on the panel which tries him. *See, e. g.* Comment, *A Case Study of the Peremptory Challenge: A Subtle Strike at Equal Protection and Due Process*, 18 St. Louis U.L.J. 662 (1974);

---

9. This rule has been incorporated by Congress in the statute relating to the selection of persons for federal service, 28 U.S.C. § 1861 (1976), and is applicable to the method of drawing juries for the Superior Court of the District of Columbia.

Comment, *Swain v. Alabama: A Constitutional Blueprint for the Perpetuation of the All-White Jury*, 52 Va.L.Rev. 1157, 1173–75 (1966); Note, *Limiting the Peremptory Challenge: Representation of Groups on Petit Juries*, 86 Yale L.J., 1715, 1738–41 (1977).

These criticisms seem to have borne fruit in at least two jurisdictions. Very recently the highest courts in California and Massachusetts have issued opinions refusing to follow *Swain. See People v. Wheeler*, 22 Cal.3d 258, 148 Cal. Rptr. 890, 583 P.2d 748 (1978); *Commonwealth v. Soares*, 377 Mass. 461, 387 N.E.2d 499 (1979).[10] In each instance, however, the authors of the majority opinions grounded their holdings on provisions in their respective state constitutions, even though they hinted that they also disagreed with the *Swain* rationale.

Needless to say, such local provisions have no bearing here. Appellant argues that the peremptory challenge tactics of the prosecutor also reflected an ignoble motive, but filed no motion in the trial court challenging the qualifications of the jury as finally seated. Plainly, the *Swain* opinion precludes this court from drawing any such invidious inference.

■ In affirming the convictions for first-degree murder, felony murder, and rape—all offenses stemming from the same criminal transaction—we did consider the possible relevance of *Whalen v. United States*, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980), *reversing and remanding* 379 A.2d 1152 (D.C.App., 1977)—a decision of the Supreme Court which came down after the case before us was argued. In *Whalen* we had sustained a conviction for felony murder and rape, holding that even when a killing is an incident of a felonious sexual assault the two offenses

were not merged. This decision was based upon our construction of the applicable provisions of the D.C.Code in which "nothing [was found] in this legislation to suggest that the underlying offense (rape) [was] nonprosecutable under the merger rule when the defendant was charged with felony murder."[11] Accordingly, we let stand the sentence imposed for rape in that case which was to take effect after the felony-murder sentence had been completed.

When this case was briefed and argued appellant did not raise the question of merger—assuming, no doubt, that our *Whalen* opinion was the law of this jurisdiction. Contrary to our view, a majority of the Supreme Court held that rape was a "lesser included" offense under the D.C. Code, for conviction for a killing in the course of rape cannot be had without proving all the elements of the latter offense. *Id.* 445 U.S. at 693–95, 100 S.Ct. at 1438–40. Therefore, the Court reasoned that multiple punishments (*i. e.*, cumulative sentences) were not authorized by Congress.

In the case at bar, however, the trial court in contradistinction to consecutive sentences provided that the prison terms imposed for each of the offenses should be served concurrently. Thus, it is not obvious that what the Supreme Court perceived as error in the *Whalen* case was committed here. Nevertheless, there have been holdings that even a concurrent sentence is an element of punishment because of potential collateral consequences.[12] Consequently, we are disturbed by the concurrent prison term imposed for the rape conviction and remand this narrow aspect of the case for resentencing.[13] We are not disturbed by the separate convictions and sentences for first-degree premeditated murder and felony murder, as we are bound by *Blango v. United States*, D.C.App., 373 A.2d 885, 888 (1977).

10. *See also People v. Smith and Lewis*, 91 Ill. App.3d 523, 47 Ill.Dec. 1, 414 N.E.2d 1117 (1980). *But cf. People v. King*, 54 Ill.2d 291, 296 N.E.2d 731 (1973).

11. *Id.* at 1159.

12. *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

13. This court took similar action in vacating the sentence for second-degree murder in *Whalen v. United States, supra* at 1155. *Cf. Ball v. United States*, D.C.App., 429 A.2d 1353 (1981).

## No. 14184

As previously stated, the second appeal in this case is from an order of the trial court, dated October 20, 1978, denying appellant's motion for a new trial on the ground of newly discovered evidence after the court had listened to four days of testimony on the motion.

These post-trial proceedings may be summarized briefly. The witness whom the United States Attorney in his letter said had given false testimony was identified as Thomas N. Curran, an F.B.I. employee, who had given expert testimony at the trial with respect to blood stains found on the victim's clothing and on the shorts appellant was wearing on the night of his arrest—two days after the killing. It was this letter which precipitated appellant's motion for a new trial, thus causing the trial court to take extensive testimony to determine whether it possessed any merit.

The only phase of Curran's testimony which the government conceded at the hearing was false concerned his asserted background. To qualify as an expert, Curran stated, *inter alia*, that he held a Bachelor's and Master's degree in science, whereas in fact he never attained a graduate degree. The court in its post-trial memorandum did not regard this inaccurate account of his academic credentials as significant, finding that the witness had enough experience and training to qualify as an expert in seriology and that there was no proof that the substance of his testimony was falsified.

At the post-trial hearing, it was revealed that long before the United States Attorney was aware of any reason to doubt Curran's expertise or verity, a supervisory official had become concerned with some written reports he had prepared for F.B.I. investigations in other jurisdictions. Inquiry disclosed that in certain reports of blood analyses no laboratory tests were made. In some other cases, his worksheets either ignored or distorted the test results. Curran resigned from the Bureau under fire when these deceptive practices came to light.

This led the supervisory official to review the files of all cases in which Curran had testified. In the 22 which resulted in convictions, the prosecutors were notified to enable them to ascertain whether any miscarriage of justice had occurred. When the United States Attorney for this District was so alerted, the instant appeal had already been argued in this court. Hence he decided to notify appellant's counsel and to review and retest the evidence which Curran had been assigned to test prior to his taking the stand. At the hearing, another technician testified that she had been assigned to assist Curran, had done the testing of the vagina swabs revealing semen and the alleged bloodstains on some exhibits, and recorded the results which Curran interpreted when testifying. Another F.B.I. expert, the chief of the seriological unit, testified that he had retested all the objects which Curran had told the jury contained human blood—a green towel, housecoat, gown and undershorts. He verified that except for the fourth item, bloodstains were detected by him. He was unable, because the portion of the undershorts containing the stains had been cut out—presumably for the laboratory test the other post-trial technician mentioned—to corroborate Curran's testimony.

It was on the basis of this record that the court found that the main thrust of Curran's testimony, *viz*, that blood was found on the shorts Doepel was wearing two days after the offense, was correct. The memorandum further noted that while Curran was on the stand he testified that blood samples taken from the decedent were both Type O, but that when this opinion was challenged on cross-examination, another test disclosed that defendant's blood should have been categorized as Type B. The jury was advised of this discrepancy by a stipulation of both counsel. The court found that this stated view of Curran and his misrepresentation of his academic background were the only known areas in which his challenged testimony, whether deliberate or inadvertent, was wrong.

Based on the premise that a witness who has been proved false in one respect should

be deemed false in all, appellant argues that the lack of complete corroboration in the post-trial proceedings discloses that the court erred in holding the testimony then taken was insufficient to grant the motion for a new trial. In denying this motion, the court pointed out that to order a new trial on the ground of newly discovered evidence, a court must find, *inter alia*, that the new evidence is material to the issue involved and of such a nature as would probably result in an acquittal. *Woody v. United States*, D.C.App., 369 A.2d 592, 594 (1977). *See Heard v. United States*, D.C.App., 245 A.2d 125 (1968).[14] The court found that while appellant's counsel had acted with diligence in presenting the motion, his showing satisfied neither of these tests. In our opinion, the court was correct.

As for materiality, the testimony concerning the undershorts had only the most meagre probative value. As government counsel publicly admitted when the defense objected to the introduction in evidence of this particular piece of clothing, there was no evidence whatsoever that appellant was wearing those particular undershorts the day of the crime.[15] In retrospect, it would appear that the prosecution overtried the case when it presented this garment over the objection of counsel. Chemical tests with respect to other minutiae, the condition of the body, and other circumstantial evidence were sufficient to show that the disarray of the living room pointed to a forcible sexual encounter—not simply a struggle for life.

We have reviewed other arguments of conscientious counsel for appellant, but discern no error in the ruling of the court respecting the motion for a new trial.

*Affirmed, but remanded for resentencing in accordance with this opinion.*

---

**14.** In *Heard* this court adopted the rule of *Thompson v. United States*, 88 U.S.App.D.C. 235, 188 F.2d 652 (1951).

**15.** The absence of any trace of semen on this garment—a fact to which the same witness testified—tended to dispel the notion that appellant was wearing underclothing in sexual engagement.