Phillip K. WATSON, Appellant,

v.

UNITED STATES, Appellee.

No. 84-1466.

District of Columbia Court of Appeals.

Argued Oct. 7, 1986.

Decided April 21, 1987.

Richard S. Greenlee, Public Defender Service, with whom James Klein, Public Defender Service, was on brief, for appellant.

Elizabeth Trosman, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Michael W. Farrell, Judith Hetherton, and

Alan D. Strasser, Asst. U.S. Attys., were on brief, for appellee.

Before PRYOR, Chief Judge, STEADMAN, Associate Judge, and GALLAGHER, Senior Judge.

GALLAGHER, Senior Judge:

Following a four-day jury trial, appellant was convicted of first-degree burglary while armed, D.C.Code §§ 22–1801 (a), –3202 (1981), assault with a dangerous weapon, *id.* § 22–502, sodomy, *id.* § 22–3502, enticing a minor child, *id.* § 22–3501(b), and taking indecent liberties with a minor, *id.* § 22–3501(a).

The court sentenced appellant to consecutive prison terms of fifteen years to life for burglary while armed, two to ten years for assault with a dangerous weapon, and five to fifteen years for sodomy. The court also sentenced appellant to prison terms of three to ten years for taking indecent liberties with a minor child and twenty months to five years for enticing a minor, the sentences on these two counts to run concurrently with each other and with the sentences on the other counts. This appeal followed.

Appellant appeals his convictions on the following three grounds:

First, appellant argues the trial court erred when it allowed evidence and testimony regarding blood and semen stains to be admitted where there was no evidence that the assailant bled during the assault or ejaculated during the sodomy, nor was there direct evidence of appellant's blood type.

Secondly, appellant urges his conviction for taking indecent liberties with a minor merged with his conviction for sodomy and must be set aside to avoid constitutional complications.

Thirdly, appellant also argues his conviction for enticing a minor should have merged with the sodomy offense and therefore should also be set aside.

We affirm the sodomy conviction, reverse the enticing and taking indecent liberties convictions, and remand for resentencing.

1. *The Government's Evidence*

M.M., a thirteen-year-old male, testified that he went to computer camp on August 10, 1983. When camp ended at 3:00 p.m., he caught a bus on Foxhall Road, got off at 16th and K Streets, and transferred to another bus, which travelled up 16th Street toward Silver Spring and took him close to his home. The bus took about 45 to 50 minutes to get to Juniper Street. He sat in the last row of the bus, on the side opposite the driver, facing forward. On the driver's side of the same row, approximately 13 feet away, M.M. noticed appellant whose face "stood out," in part because his eyes appeared crossed. When he looked at him, appellant asked him what he was looking at, to which he said "nothing," and moved to the front of the bus in order to put some distance between himself and appellant. At this point, he had been on the bus for about 25 to 30 minutes and had observed appellant clearly and in good light for about 10 minutes.

M.M. got off the bus at 16th and Juniper Streets and started walking up Juniper Street. Although he was the only person to get off at his stop, the bus stopped again after travelling only a few feet, and appellant got off. He began walking in the same direction as M.M., at a faster pace, on the opposite side of the street, and crossed over into an alley on M.M.'s side of the street, meeting him there. Recognizing appellant from the bus, M.M. was frightened because he thought appellant might do something, so he said, "[N]o hard feelings from the bus?" Appellant answered, "It's all right." At this point, M.M. was two blocks from his home. Although appellant was beside and slightly behind him, he was just a couple of feet away and M.M. could see his face. As they walked toward his home, appellant said that he used to live in the neighborhood and that he was trying to get somewhere but was lost. He asked M.M. if he could use his phone. M.M. said no, explaining that his parents didn't allow strangers in the house. Appellant then offered him $2.00 for the use of his phone and again he refused.

As they approached M.M.'s house, he saw a neighbor, Mr. Jones, walking toward him on the opposite side of the street. Mr. Jones said "hi" and walked up to his own house. As M.M. was unlocking his front door, appellant was walking up the walkway. He entered his house and tried to shut the door, which was set to "self-lock," but before he could close it, appellant pushed the "unlock" button on the side of the door and disengaged the self-lock mechanism. He then pushed the door open and brandished a nail file. M.M. started to cry. Appellant told him to be calm and said he just wanted to use the bathroom and the phone. He held the nail file out and told M.M. to go upstairs. Appellant followed him upstairs. Before going upstairs, M.M. observed appellant's face in good light for about one minute.

Once they were upstairs, appellant told M.M. to go into his room. Appellant then went into M.M.'s mother's room, took some hair cream, and brought it back to the room. He ordered M.M. to remove his pants and lie on his stomach. When he refused, appellant stabbed him in the stomach with the nail file, causing him to fall back onto his bed. Appellant again ordered him to take off his pants and underpants and to lie on his stomach. This time he complied because he did not want to be hurt again. M.M. testified that before turning over, he had an opportunity to look at appellant for about a minute and a half. Appellant then removed his pants and underpants, put hair cream on his penis, laid on top of M.M., and put his penis into M.M.'s rectum. Appellant moved around in a circular manner for several minutes, breathing heavily. M.M. apparently did not know whether appellant had ejaculated, although he testified on cross-examination that he felt "sticky stuff" in his underwear after the incident.

After appellant finished, he got up, put on his pants, and told M.M. to show him "where the money was." M.M. took appellant into his parent's room where money and his father's gas gun were usually kept in a dresser drawer. M.M. opened the drawer and picked up the gas gun to defend himself, but appellant took the gun from him. He again clearly observed appellant's face since daylight was coming in through the windows. There was no money in the drawer, so appellant went back to M.M.'s room and took M.M.'s watch. He then instructed M.M. to stay upstairs and he left through the front door with both the watch and the gun. Soon afterward, M.M.'s mother called and he told her what had happened. Still frightened and upset from the attack, he locked the doors to the house, armed himself with a knife and metal bar, and called his aunt. When the police and M.M.'s father arrived, he told them what had happened.

When asked about his own clothes at the time of the offense, M.M. testified that he was wearing a shirt that was clean and free of any marks or stains when he put it on that morning and when he came home from camp. That shirt, however, had blood on it after he was assaulted. Because the shirt was new and because he liked it, he had looked at it when he was at camp and had not seen any spots on it. At trial, M.M. identified a small hole on the shirt beneath the letter "A" as the spot where appellant had stabbed him with the nail file.

M.M.'s father testified that he came home from work between 4:00 and 5:00 p.m. on August 10, 1983, after his wife called him. When he got home, he saw his son, his sister-in-law, and a police officer in his living room. His son appeared upset and frightened and appeared to have been crying. He also noticed blood on his son's shirt. He testified further that he had owned a tear gas gun for thirteen years prior to August 10, 1983, which he kept in the top drawer of his dresser. When he looked for the gun at the request of the police, he discovered that it was missing. He had given no one permission to take the gun or to enter his house.

Officer Frank Prusak of the Metropolitan Police Department went to M.M.'s home at around 6:00 p.m. on August 10 and spoke to M.M. who reported having been sexually assaulted. According to Prusak, M.M. described his assailant as a medium-complected black male in his early 20's,

between five feet four inches and five feet seven inches in height, and having a slim build and short hair. He also said that his assailant's eyes appeared crossed, and that he was wearing cut-off pants, a green t-shirt, sneakers with the words "Stadia" written on them, and grey athletic socks with maroon stripes.[1] Officer Prusak provided this information to Lieutenant Harlow and broadcast this description on the police radio.

Lieutenant John Harlow received this description from Officer Prusak at M.M.'s home around 6:30 p.m. on August 10. Lieutenant Harlow left the house about 8:00 p.m. and started over toward the Fourth District Police Station by way of Alaska Avenue. When he was only a short distance from M.M.'s home (about three blocks) he saw appellant standing at a bus stop and noted that he matched the description M.M. had given Officer Prusak. Lieutenant Harlow stopped his car, walked over to appellant, and, in order to learn his identity, asked him if his name was "Porter." Appellant said no, that his name was Phillip Watson, and provided his address, social security number and birthday in response to Harlow's inquiries. Appellant was wearing brown cut-off pants, frayed at the edges, a silky green polo-type shirt, grey athletic-type socks with burgundy stripes at the top and white "Pro Player" sneakers with a green stripe around them. He was five feet nine inches tall and he had a slim build and a medium brown complexion. At around 9:00 or 9:30 the same evening, Harlow provided appellant's name to Detective Coble.

Dr. Stephen Arpadi, a pediatric resident at Children's Hospital, examined M.M. in the emergency room at Children's Hospital on August 10, 1983. A police detective provided Dr. Arpadi with a police evidence kit, which he used to take blood and saliva samples and an anal swab. On examining him, Dr. Arpadi observed a puncture wound in M.M.'s abdomen, about three-quarters of an inch in width and a half-inch deep, which was consistent with his having been stabbed with a nail file. He also observed some bruising around the anus and tenderness in the rectum, which was consistent with rectal sodomy.

The next day M.M. went to the police department and met with Detective Coble of the Sex Offense Branch. Detective Coble showed him a photo spread containing appellant's photograph. When he asked him if he saw anyone he recognized in the spread, M.M. picked out appellant's photograph and said, "There he is. That's him. I'm positive." He then wrote these words on the back of appellant's photograph at Detective Coble's request, along with the date and time.

During the late evening of August 11 or the early morning hours of August 12, appellant was arrested at 3801 Ninth Street, S.E. At the time of the arrest, Lieutenant Harlow noted that appellant was wearing the same clothes he had been wearing when Harlow saw him on the street on August 10. Appellant's shorts, shirt, shoes, and socks were seized after his arrest and sent to the FBI for analysis.

On August 16, M.M. attended a police department lineup which was witnessed by Detective Geneva Couser. On viewing the lineup, he selected appellant as his assailant. M.M. testified that his photo and lineup identifications were based primarily on appellant's eyes, but also took into account the shape of his face, including his high cheekbones. He also identified appellant as his assailant at trial and said there was no doubt in his mind that appellant was the person who had assaulted him.

Randall S. Murch, a forensic serologist with the FBI, testified that he had examined various pieces of clothing and blood and saliva samples drawn from M.M. He expressed the opinion that M.M. had Type O blood and was a nonsecretor. However, no sample of blood and saliva

---

1. At trial, M.M. described his assailant as skinny with a short hair cut and taller than himself at the time of the offense (five feet tall). He did not recall the color of appellant's shirt but thought his pants were blue or green in color, and he did recall that appellant was wearing socks and white Kruger or Cougar sneakers with green stripes that were round in the front and high in the back.

from appellant was submitted for comparison purposes because the trial court correctly denied the government's request for a blood order as untimely.[2] A small spot of blood found on M.M.'s shirt was Type A blood. Moreover, a spot of blood found on the hemline of appellant's shirt was also Type A, and semen stains found on the front of appellant's shorts were deposited by a Type A secretor.[3]

According to Murch, 40 percent of the white population and 27 percent of the black population in the United States have Type A blood. Eighty percent of each of those proportions are secretors; thus 32 percent of the white population and 21 percent of the black population are Type A secretors. On cross-examination, Agent Murch conceded that he was unable to determine the race or sex of the person or persons who deposited the blood stains on the exhibits he examined, nor could he determine how long the blood or semen stains had been there or if they were left at the same time.

### 2. The Blood Stain and Semen Stain Evidence

Appellant argues that the trial court abused its discretion in admitting the serologist's testimony as its marginal probative value was far outweighed by its potential for prejudice. The government sought to introduce the serologist's findings in an effort to meet the necessary corroboration requirements and for the purpose of identification. The government argued that because the blood and semen were on Watson's clothing, it was more likely that they were his blood and semen than that they were someone else's.

■ We need not decide whether the admission of this evidence was in fact error, because we conclude that in any event, its admission was harmless. In assessing harmless error, we seek to ascertain whether we can "say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially

2. Before *voir dire* commenced, the prosecutor tendered to the court a proposed order that would permit the government to take blood and saliva samples from appellant. The prosecutor explained that he had not made the request sooner because he had not received the FBI report until a week or two prior to trial. He had been under the impression from having discussed the case with defense counsel that the case would be resolved before trial by way of a plea, and he did not realize until the night before trial that an FBI examiner could type a blood sample within an hour or two. The prosecutor informed the court and counsel that Type A blood, not the victim's, was found on both the victim's shirt and appellant's shirt, and that he therefore wished to determine if appellant had Type A blood. Although appellant's counsel conceded that he had been provided with a copy of the FBI report disclosing that Type A blood was found on both the victim's shirt and appellant's shirt and that the blood was not the victim's, he maintained that he was not on notice that blood evidence was a factor in the case. Thus, he opposed the request as untimely, claiming that he would not have an adequate opportunity to prepare to deal with the issue at trial if the court issued the blood order. The court noted that the potential of the issue had long been apparent, and in the face of appellant's objection, denied the government's request for a blood order, noting that it would be inclined to grant the request if the case was continued.

3. Murch explained that a "secretor" is a person who releases blood group-like substances (termed H, A and B) into body fluids other than blood, such as semen, saliva and vaginal secretions. A secretor's blood type can be determined from these body fluids but it is impossible to determine the blood type of a nonsecretor from any of his body fluids other than his blood. All secretors secrete the H blood group substances; an A secretor secretes A and H; a B secretor secretes B and H; and an AB secretor secretes A, B, and H; and an O secretor secretes only H. The transcript reads: "No secretor only H...." It is clear from the context and from further testimony on page 478 that this testimony was erroneously transcribed and should read, "An O secretor only H."

Murch had analyzed appellant's shorts and detected the presence of semen on four locations on the front of this item. Three of the four spots showed the presence of A and H blood group substances, leading Murch to conclude they were deposited by an A secretor. One of the spots showed only the H blood group substance, indicating that it was probably deposited by an O secretor, but was possibly deposited by an A secretor, a B secretor, or an AB secretor. When Murch examined another stain on appellant's shirt near the blood stain, tests indicated that semen might be present in that stain but the tests were not conclusive.

swayed by the error...." *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946); *see also Hairston v. United States,* 500 A.2d 994, 998 (D.C.1985); *Washington v. United States,* 499 A.2d 95, 102 (D.C.1985).

Here, the government was required to present corroborative evidence because the defendant was charged with a sex offense against a youthful victim.[4] The corroboration threshold, however, has never been difficult to cross. "Corroboration ... need only consist of circumstances which tend to support the victim's testimony, and need not consist of evidence corroborating every detail of the acts charged." *Jackson v. United States,* 503 A.2d 1225, 1227 (D.C. 1986).

M.M. provided three separate identifications of Phillip Watson: he selected his picture from a photo spread, he picked him out at a line-up, and he identified him in court. The boy reported the assault immediately by telling both his mother and his aunt. He provided a detailed description of the assailant to the police. The results of his medical examination were consistent with the rectal sodomy and stab wound that he reported. In addition, although the boy's neighbor was unable to positively identify Watson at the line-up, the neighbor did testify that he saw M.M. and a stranger walking down the sidewalk toward M.M.'s house at the time of the incident.

Thus, the admission of the blood and semen stain evidence, offered for the purposes of identification and corroboration, is inconsequential in light of the other reliable, corroborative and identifying evidence offered by the government. Therefore, we conclude that the trial court's error, if any there be, was harmless in light of this other significant evidence.

### 3. Indecent Liberties Merges With Sodomy

 The appellant argues, and the government concedes, that under the present facts, the taking of indecent liberties merged with sodomy. This court recently held in *Jackson v. United States, supra,* 503 A.2d at 1229, that indecent liberties merges with sodomy where there is a single incident. We reverse the conviction and remand with directions to vacate appellant's sentence[5] for taking indecent liberties with a minor.

### 4. Merger of Enticement with Offense of Sodomy

Appellant's argument for the merger of enticement of a minor under D.C. Code § 22–3501 (1981), with the crime of sodomy under D.C. Code § 22–3502, comes for the first time before this court as a question regarding the intent, purpose and operation of § 22–3501 (d), a statutory provision enforced in this jurisdiction for almost thirty years.[6]

In considering these questions, appellant urges a *Blockburger* analysis. The Supreme Court in *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), set forth its analysis to determine whether or not elements of a certain offense consisting of several separate acts are intended to be continuous and therefore punishable as a single crime, or are independent and therefore separate, punishable offenses.

"The test is whether the individual acts are prohibited or the course of action which they constitute. If the former, then each act is punishable separately.... If the latter, there can be but one penalty." *Id.* at 302, 52 S.Ct. at 181 (citation omitted). The first phase of the analysis looks to the nature and character of the offense in order to determine whether "[i]t is, inherent-

---

4. Even though the corroboration requirement for conviction of a sex offense against a youthful victim has been both legislatively and judicially abolished, *Gary v. United States,* 499 A.2d 815, 834 & n. 22 (D.C.1985) (en banc) and D.C. Code § 23–114, it was in effect at the time of the sexual assault and trial in this case.

5. The concurrent nature of the sentences does not preclude appellant's relief here. *See Harling v. United States,* 460 A.2d 571, 572 (D.C.1983); *see also* note 9 at 743, *infra.*

6. The Miller Act, as it was known, 62 Stat. 347, 80th Cong., 2d Sess., ch. 428, June 9, 1948, § 103.

ly, a continuous offense, having duration; and not an offense consisting of an isolated act." *Id.* The second phase looks to the statute on its face in order to determine whether two separate offenses are created. In the absence of facially distinct (or continuous) offenses, the court must determine the legislative intent. *Id.* at 303–04, 52 S.Ct. at 181–82.

According to appellant, "enticing" (in this case taking the complainant upstairs to the bedroom) was merely incidental to the commission of the sodomy, and so, just as a kidnapping that is merely incidental to rape merges with rape, enticing and sodomy should merge here as well. *See (Thomas) Robinson v. United States,* 388 A.2d 1210 (D.C.1978) (kidnapping charge vacated where defendant dragged victim 63 paces and then tried to rape her).

The first argument raised by appellant is that the conviction for enticing a minor must be set aside as, on these facts, it merged with the sodomy even though each offense "requires proof of an additional fact that the other does not." *Blockburger, supra,* 284 U.S. at 304, 52 S.Ct. at 182.

■ Sodomy requires proof of penetration, which is not an element of enticing a minor child; enticing requires a specific intent, while sodomy does not. Because sodomy and enticing a minor are not necessarily "continuous" by nature, the offenses do not merge under the first phase of the *Blockburger* analysis, *i.e.,* there may be instances where a defendant could be convicted of both sodomy and enticing, even when the offenses are part of a single incident. *See (Julius) Robinson v. United States,* 501 A.2d 1273 (D.C.1985) (defendant

properly convicted of assault with intent to commit rape and assault with intent to commit sodomy when the latter stemmed from a "fresh impulse" minutes later). In the instant case, the enticing and the sodomy were congruent in time and place. The asportation of the victim to the bedroom was part of the continuous offense here as there was no evidence of a break in time or any new motive evincing a "fresh impulse" having occurred between appellant's pursuit of his victim and the final act of penetration in the victim's bedroom. *See id.* at 1276.

■ More significantly, however, under the second phase of the *Blockburger* analysis, the crimes here were obviously intended by the legislature to have merged. Appellee originally put forth two claims that purport to explain the intent of Congress. First, appellee argued that the legislature intended to allow convictions for both sodomy and enticing because it specifically prohibited convictions for enticing and carnal knowledge, D.C. Code § 22–2801 (1981); *see* Brief for Appellee at 22, citing D.C. Code § 22–3501 (d) (1981). Appellee asserted that the failure to similarly exclude sodomy "is a strong indication that the legislature intended to allow convictions for both sodomy and enticing."

A search of the legislative history, however, shows clearly that the opposite is true. H.R. REP. No. 1787, 80th Cong., 2d Sess. (1948); S. REP. No. 1377, 80th Cong., 2d Sess. (1948), U.S.Code Cong.Serv. 1948, p. 1714. In fact, the statute as enacted [7] explicitly proscribes a conviction of enticement of a minor where an offense of rape *or sodomy* is involved. Responding to a

---

7. We note here that the statute as enacted differs in this important respect with the statute as codified. Apparently, an error in transcription occurred during codification. *Compare* 62 Stat. 347, § 103(d), 80th Cong., 2d Sess., ch. 428, June 9, 1948, *with* D.C. Code § 22–3501(d) (1951 & 1981 ed.):
The statute as enacted reads:
 (d) The provisions [of § 22–3501] shall not apply to the offenses covered by section 104 of this Act [now codified at § 22–3502: SODOMY] or by section 808 of the Act of March 3, 1901 [now codified at § 22–2801: RAPE].
The statute as codified reads:

 (d) The provisions [of § 22–3501] shall not apply to the offenses covered by § 22–2801 [RAPE only].
There is no apparent explanation for this error other than a mistake in transcription on the part of the codifier.
 "It is of course, an indispensable part of a scrivener's business to verify the accuracy of his copy, word by word, [however] it is a very dull, wearisome, and lethargic affair ... to some sanguine temperaments, it would be altogether intolerable." H. MELVILLE, *Bartleby,* in THE PIAZZA TALES (1852), *reprinted at* J. LEYDA, *The Portable Melville* 474 (1952).

question raised *sua sponte* by this court at oral argument, the government now concedes, and we agree, that this is the correct view of the statute.

Both the House and Senate Reports by the Committee on the District of Columbia, while discussing the Miller Act provisions regarding the taking of indecent liberties with a minor and the enticement of minors, commented as follows:

Paragraph (d) of the proposed section withdraws from the section the offense of carnal knowledge *and sodomy,* which are covered in other sections of the code, and which provide for more severe penalties than those provided in this section.

H.R.REP. No. 1787, 80th Cong., 2d Sess. at 4 (1948) (citations omitted) (emphasis added), and S.REP. No. 1377, 80th Cong., 2d Sess. at 3 (1948) U.S.Code Cong.Serv.1948, p. 1717 (citations omitted) (emphasis added).

■ This legislative history supports the fact that the statute as enacted was meant to merge the crime of enticement with sodomy. To argue otherwise would lead to absurd results. If a defendant cannot be convicted of both rape of a female child and enticing a female child for the purpose of taking indecent liberties, *and* if a defendant cannot under some factual circumstances be convicted of both rape and kidnaping, it seems illogical to maintain that a defendant could be convicted of both sodomy of a male child and enticing a male child for the purpose of taking indecent liberties.

Admittedly, the rape and sodomy provisions reflect some differences in terms of the particular sexual act prohibited and the severity of the maximum penalties available. Yet, to the extent that all three statutes (rape/carnal knowledge, sodomy, and indecent acts with a minor) are designed to punish the sexual assault and exploitation of children, there is no reason to distinguish between sexual assault of boys and sexual assault of girls. It would appear that Congress' intent, manifest in the legislative history and the statute *as enacted,* precludes finding such a distinction.

Because "the Statutes at Large prevail over the Code whenever the two are inconsistent," *American Bank & Trust Co. v. Dallas County,* 463 U.S. 855, 864 n. 8, 103 S.Ct. 3369, 3376 n. 8, 77 L.Ed.2d 1072 (1983) (citing *Stephan v. United States,* 319 U.S. 423, 426, 63 S.Ct. 1135, 1136, 87 L.Ed. 1490 (1943)), the Statute at Large governs; and dual convictions for enticing a minor child and sodomy cannot both stand.[8] This is so because the Code of the District of Columbia is only "prima facie" evidence of the law in force in the District of Columbia. *See* 1 U.S.C.A. § 204(b). *See also Royer's Inc. v. United States,* 265 F.2d 615, 618 (3d Cir.1959) ("[N]o one denies that the official source to find United States laws is the Statutes at Large and that the Code is only prima facie evidence of such laws"); *Abell v. United States,* 518 F.2d 1369, 1376 (U.S. Ct. Claims 1975) ("[E]rrors do occur in codification and where there is a conflict between the codification and the Statutes at Large, the Statute at Large must prevail"); Price, *Effective Legal Research* 24 (4th ed. 1979) ("[I]f the form of the law found in the Code is a variance with that in the Statutes at Large, the Statutes at Large version governs.")

Since D.C. Code § 22–3501 (d) conflicts with Section 103 (d) of the Act of June 9, 1948, ch. 428, 62 Stat. 347, it may not be given effect. Thus, appellant's conviction for enticing a minor should be vacated in order to avoid any constitutional or collateral difficulties.[9]

---

**8.** Appellant correctly points out that the law is that found in Sections 103 and 104 of the Act of June 9, 1948, 62 Stat. 347, rather than in D.C. Code § 22–3501 (d), as that Act has not been amended or repealed. In 1981, the D.C. Council attempted to repeal Sections 103 and 104 of the Act of June 9, 1948 when it adopted the District of Columbia Sexual Reform Act of 1981, D.C. Act No. 4–69, 28 D.C. Reg. 3409 (1981). (S.A.R.A.) However, the United States House of Representatives vetoed S.A.R.A. and it never became law. *See Gary v. United States, supra,* 499 A.2d at 815.

**9.** *See Doepel v. United States,* 434 A.2d 449, 459 (D.C.1981), where this court makes it clear that even *concurrent* sentences for offenses which merge are prohibited. In that case, the court remanded for resentencing where the trial court had imposed concurrent sentences for felony

Accordingly, we affirm the sodomy conviction, reverse the indecent liberties and enticing convictions, and remand for resentencing.

*Affirmed in part, reversed in part, and remanded.*

murder and the underlying rape, explaining "even a concurrent sentence is an element of punishment because of potential collateral consequences." *Id.* at 459. The Supreme Court in *Ball v. United States,* 470 U.S. 856, 105 S.Ct. 1668, 84 L.Ed.2d 740 (1985), stated that "for purposes of applying the *Blockburger* test ... 'punishment' must be the equivalent of a criminal conviction and not simply the imposition of sentence." *Id.* at 1672. The Court explained:

The separate *conviction,* apart from the concurrent sentence, has potential adverse collateral consequences that may not be ignored.

For example, the presence of two convictions on the record may delay the defendant's eligibility for parole or result in an increased sentence under a recidivist statute for a future offense. Moreover, the second conviction may be used to impeach the defendant's credibility and certainly carries the societal stigma accompanying any criminal conviction.... Thus, the second conviction, even if it results in no greater sentence, is an impermissible punishment.

*Id.* at 1673–74 (emphasis in original; citations omitted).