THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ADOLPH SMITH *et al.*, Defendants-Appellants.

First District (4th Division)    Nos. 78-992, 78-1087 cons.

Opinion filed December 4, 1980.

Michael J. Rovell, William C. Staszak, and Vicki A. Thompson (Jenner & Block, of counsel), for appellant Adolph Smith.

James J. Doherty, Public Defender, of Chicago (Timothy P. O'Neill, Assistant Public Defender, of counsel), for appellant Larry Lewis.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Pamela L. Gray, and Nancy Lynn Martin, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE JOHNSON delivered the opinion of the court:

Defendants, Adolph Smith and Larry Lewis, appeal from a judgment of conviction entered by the circuit court of Cook County. They had been charged by information with the crimes of aggravated kidnapping and robbery of an automobile and currency. After a jury trial, defendants were found guilty of aggravated kidnapping (Ill. Rev. Stat. 1975, ch. 38, par. 10—2(a)(3)), which included the crime of unlawful restraint (Ill. Rev. Stat. 1975, ch. 38, par. 10—3) and robbery (Ill. Rev. Stat. 1975, ch. 38, par. 18—1). Prior to sentencing, the trial judge vacated both the robbery charge and the unlawful restraint charge. Defendant Smith was sentenced to 6 years and defendant Lewis to 5 years in the penitentiary. They individually appeal from the judgment against them, and their cases are consolidated before us. We reverse the circuit court's judgment finding defendants guilty of aggravated kidnapping, and we reverse the court's order vacating the charge of robbery and affirm the jury's finding of guilty as to robbery.

Prior to trial, defendants made a motion for mistrial on the grounds that they were not going to get a jury of their peers. Defendants charged that of the seven peremptory challenges exercised by the State, four had been for nonwhite individuals. The trial judge stated he did not agree because there were good and substantial reasons for each of the dismissals. He denied defendants' motion for a mistrial, stating: "And I don't think there is any law [that] says they must accept them of any kind of race or nationality." The next juror, who was black, was excused for cause over defendants' objection. Defendants again offered a motion for mistrial because the State was excluding blacks from the jury. The motion was denied.

The first witness for the State was Susan McAuliffe, who testified she was living at 1360 Sandburg Terrace, in Chicago, with her family on March 1, 1977. She stated she was driving in one car and her boyfriend, Edward Szatkowski, in another when they stopped on North Avenue between LaSalle and Clark streets. The witness said she returned to her apartment to obtain the title to the car her boyfriend was driving, as it bore no license plates. When she returned 10 minutes later, the car and her boyfriend were gone. She finally heard from Szatkowski at 3:45 p.m., at which time they went to a police station where they recovered the automobile.

Edward Szatkowski testified that on March 1, 1977, he and Susan

McAuliffe, his girlfriend, left her parents' apartment to take her new car to a garage. He explained that title to the new car had been left at the apartment. Szatkowski was afraid he might be stopped because the car did not bear license plates. He pulled over on North Avenue between LaSalle and Clark streets while McAuliffe went back to her home to obtain the title.

While Szatkowski was parked at the curb, two men, whom he had observed loitering for 5 to 10 minutes prior, approached the car and one of them knocked on the window. The witness stated he opened the door slightly, thinking the men might be interested in buying the car since there were "For Sale" signs in the window. One of the men pulled the door open, grabbed Szatkowski's head and forced it down to the seat. The man entered the car and told Szatkowski to be quiet; the other man entered from the passenger's side. Szatkowski identified defendant Smith as the man who pushed his head down and slid into the driver's seat. He identified defendant Lewis as the man who entered the car from the passenger's side.

Szatkowski further testified that Lewis told him not to make any noise or they would kill him. The witness offered defendants the car and whatever else they wanted in exchange for his freedom. Smith told him that he and Lewis had just robbed a bank and they needed the car to get out of the area. Defendants drove off with Szatkowski who repeatedly asked to be let out of the car. According to the witness, he was asked for all the money he had, which was only 60 cents. He was asked for his wallet; when defendants discovered it empty, they returned it. He told defendants he did not have any more money in his possession.

Further testifying, Szatkowski stated that Lewis told him he would write down his (Szatkowski's) name, address and telephone number so that the car could be returned. Smith drove the car into a service station to obtain gas. Upon leaving the car, Lewis warned Szatkowski not to move or there would be shooting. When Lewis returned, he wrote the name, address and telephone number of Szatkowski on a parking sticker. Smith pulled out of the service station and drove south on Clark Street. At the intersection of Clark and Madison, Smith stopped the car. Lewis let Szatkowski out, warning him not to call the police or he would never see his car again. Defendants proceeded east on Addison Street. Szatkowski ran four blocks to his father's house and called the police. He later went to the police station, where he identified both defendants in a lineup.

On cross-examination, Szatkowski admitted he never saw either defendant with a weapon. He also stated defendants gave back the 60 cents he had given them, plus an additional 5 cents. Szatkowski stated he did not give defendants permission to take his car keys, to drive his car, or to take his money.

Chicago police officer John Grizzoffi testified that on March 1, 1977, at approximately 4:30 p.m., he was driving in his squad car when he received a radio message that a car had just been taken in a robbery. The description of the automobile was a 1969 Oldsmobile Cutlass with a red body and a white convertible top, bearing no license plates. Officer Grizzoffi spotted the car parked in a gas station. He questioned the station attendant and then walked across the street to the hardware store. When Officer Grizzoffi entered the store, he observed two men walking toward the check-out counter. At trial, Officer Grizzoffi identified the two defendants as the men he saw in the hardware store. He stopped Smith and Lewis in the store, placed them under arrest, and advised them of their constitutional rights. The officer stated he searched both men, recovering a set of car keys from Smith and a sheet of paper on which was written the name, Szatkowski, along with an address and a telephone number, from Lewis.

The jury found defendants guilty of aggravated kidnapping, robbery, and unlawful restraint. Defendants' motion for a directed verdict was denied. The trial court determined the evidence was sufficient to warrant a charge of aggravated kidnapping.

The Illinois Criminal Code defines kidnapping as follows:

"(a) Kidnaping occurs when a person knowingly:

(1) And secretly confines another against his will, or

(2) By force or threat of imminent force carries another from one place to another with intent secretly to confine him against his will, or

(3) By deceit or enticement induces another to go from one place to another with intent secretly to confine him against his will." (Ill. Rev. Stat. 1977, ch. 38, par. 10—1(a)(1) to (3).)

Aggravated kidnapping is defined as follows:

"(a) A kidnaper within the definition of paragraph (a) of Section 10—1 is guilty of the offense of aggravated kidnapping when he:

(1) Kidnaps for the purpose of obtaining ransom from the person kidnaped or from any other person, or

(2) Takes as his victim a child under the age of 13 years, or

(3) Inflicts great bodily harm or commits another felony upon his victim, or

(4) Wears a hood, robe or mask or conceals his identity, or * * *." Ill. Rev. Stat. 1977, ch. 38, par. 10—2(a)(1) to (4).

In reviewing the trial court's judgment, we limit the application of the kidnapping statute. Kidnapping is a prerequisite of aggravated kidnapping (see *People v. Marin* (1971), 48 Ill. 2d 205, 269 N.E.2d 303; *People v. Landis* (1966), 66 Ill. App. 2d 458, 214 N.E.2d 343), and, in our

view, the trial court's judgment is subject to reversal on the issue of whether there was an actual kidnapping as contemplated by statute.

In *People v. Levy* (1965), 15 N.Y.2d 159, 204 N.E.2d 842, 256 N.Y.2d 793, the New York Court of Appeals was faced with a situation similar to the case at bar. The two defendants forced two victims into their car at gunpoint. The car was driven some 27 blocks, during which time the victims were robbed of jewelry and money. The court affirmed the robbery conviction but overruled the kidnapping conviction. It adopted a position we choose to follow in this case when it said:

> "We * * * limit the application of the kidnapping statute to 'kidnapping' in the conventional sense in which that term has now come to have acquired meaning. There may well be situations in which actual kidnapping in this sense can be established in conjunction with other crimes * * *. But the case now before us is essentially robbery and not kidnapping.
> * * *
> In the case before us the movement of the automobile, which was itself the situs of the robbery, was not essentially different in relation to the robbery than would be the tying up of a victim in a bank and his movement into another room. In essence the crime remained a robbery although some of the kidnapping statutory language might literally also apply to it." *Levy*, 15 N.Y.2d 159, 164-65, 204 N.E.2d 842, 844, 256 N.Y.S.2d 793, 796.

The same court applied its rule in *People v. Lombardi* (1967), 20 N.Y.2d 266, 282 N.Y.S.2d 519, 229 N.E.2d 206, and followed it in *People v. Miles* (1969), 23 N.Y.2d 527, 297 N.Y.S.2d 913, 245 N.E.2d 688. In *People v. Cassidy* (1976), 40 N.Y.2d 763, 765-66, 358 N.E.2d 870, 872, 390 N.Y.S.2d 45, 47, the court said:

> "[The *Levy-Lombardi* rule] was of judicial origin and was based on an aversion to prosecuting a defendant on a kidnapping charge in order to expose him to the heavier penalty thereby made available, where the period of abduction was brief, the criminal enterprise in its entirety appeared as no more than an offense of robbery or rape, and there was lacking a genuine 'kidnapping' flavor * * *."

Other State courts have followed or approved the *Levy-Lombardi* rule. See *People v. Daniels* (1969), 71 Cal. 2d 1119, 459 P.2d 225, 80 Cal. Rptr. 897; *Wright v. State* (1978), 94 Nev. 415, 581 P.2d 442; *State v. Wilder* (1971), 4 Wash. App. 850, 486 P.2d 319.

The Illinois Supreme Court considered the *Levy-Lombardi* rule in the case of *People v. Canale* (1972), 52 Ill. 2d 107, 285 N.E.2d 133. In *Canale*, the court was asked to reverse an aggravated kidnapping con-

viction where the harmful conduct was incidental to the felony committed. The court noted the rationale of the rule was to prevent the elevation of lesser crimes of rape and robbery into the more serious crime of kidnapping. It held that, unlike New York, Illinois did not recognize aggravated kidnapping as a more serious offense than either rape or robbery.

However, since the adoption of the Unified Code of Corrections (Ill. Rev. Stat. 1973, ch. 38, par. 1001—1—1 *et seq.*), aggravated kidnapping is a Class 1 felony, and robbery is a Class 2 felony. The premise upon which the court in *Canale* based its rejection of the *Levy-Lombardi* rule is no longer viable. We are, therefore, free to consider its application to the case at bar.

The United States Court of Appeals for the Third Circuit recently considered a case involving convictions of kidnapping and robbery. In *Government of the Virgin Islands v. Berry* (3d Cir. 1979), 604 F.2d 221, two defendants were convicted of kidnapping and robbery, and sentenced to life imprisonment on the kidnapping charges. The court affirmed the conviction for robbery and reversed the conviction for kidnapping. The court's decision was based on the recognition that there is an inequity inherent in permitting kidnapping prosecutions of those who, in reality, committed lesser or different offenses, of which temporary seizure, asportation, or detention played an incidental part. We firmly agree.

Further, the court of appeals approached the problem of determining when a detention or asportation rises to the level where a kidnapping may be said to have taken place. The court's review of approaches taken in other jurisdictions provided:

> "In California, it has been held that kidnapping does not occur when asportation is merely 'incidental to' the commission of other substantive crimes. *Daniels*, 71 Cal. 2d at 1139, 80 Cal. Rptr. at 910, 459 P.2d at 238; see *People v. Adams*, 389 Mich. 222, 205 N.W.2d 415 (1973); *Cuevas v. State*, 338 So.2d 1236 (Miss. 1976). New York cases have adopted a 'merger' doctrine, which bars conviction for kidnapping when the 'ultimate' crime, such as robbery or rape, 'could not be committed in the form planned without the limited asportations' inherent in the crime. *Miles*, 23 N.Y.2d at 539, 297 N.Y.S.2d at 922, 245 N.E.2d at 694. The Model Penal Code treats the duration of the detention, and the distance of the asportation as significant, concluding that kidnapping exists only if the victim is isolated 'for a substantial period,' or is carried away a 'substantial distance.' Model Penal Code §212.1; see *People v. Caudillo*, 21 Cal. 3d 562, 146 Cal. Rptr. 859, 580 P.2d 274 (1978); *Wright v. State*, 94 Nev. 415, 581 P.2d 442 (1978). Finally, it has been held that kid-

napping indictments should be dismissed unless the asportation or detention which occurs during the course of the commission of another crime 'significantly increases the dangerousness or undesirability of the defendant's behavior.' See *People v. Timmons*, 4 Cal. 3d 411, 415, 93 Cal. Rptr. 736, 739, 482 P.2d 648, 651 (1971); *Wright*, 94 Nev. at 415, 581 P.2d at 443; Note, 53 Col. L. Rev. at 556; Comment, 110 U.Pa. L.Rev. 293, 296 (1961)." 604 F.2d 221, 227.

In establishing an approach for this State to follow, we would adopt four factors suggested by *Government of the Virgin Islands v. Berry* (3d Cir. 1979), 604 F.2d 221. Those factors are:

"(1) [T]he duration of the detention or asportation; (2) whether the detention or asportation occurred during the commission of a separate offense; (3) whether the detention or asportation which occurred is inherent in the separate offense; and (4) whether the asportation or detention created a significant danger to the victim independent of that posed by the separate offense." *Government of the Virgin Islands*, 604 F.2d 221, 227.

It is clear that the gist of the case before us is robbery. The victim was driven for a short distance—approximately 20 minutes from where he first encountered defendants. During that time, defendants took control of his car and personal property while threatening the use of force.

We would envision the charge of unlawful restraint as an acceptable alternative to aggravated kidnapping where, as here, asportation is merely incidental to commission of a felony. Where it is determined that the asportation was only for a short period of time, occurred during the commission of a separate offense, and offered no significant danger to the victim independent of that posed by the felony, an aggravated kidnapping charge should not rest. The judgment reached by the trial court was, therefore, improper.

Defendants bring to our attention the jury selection process which took place prior to trial. They assert that although the venire of petit jurors from which the jury was chosen included several blacks and a woman, the final jury consisted exclusively of white males. Defendants are black males, and the victim, also the State's key witness, is a white male.

Following the State's exercise of seven peremptory challenges, defense counsel moved for mistrial. He said the State had used four of its seven peremptory challenges to exclude nonwhite persons, and that it was clear that a fair trial was not possible. The motion was denied and the trial court said: "And I don't think there is any law [that] says they must accept any kind of race or nationality." With that statement, defendants contend it was error for the court to deny their motion.

We are well aware of the United States Supreme Court decision in *Swain v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824, and the Illinois Supreme Court decisions which follow Swain (see *People v. King* (1973), 54 Ill. 2d 291, 296 N.E.2d 731; *People v. Butler* (1970), 46 Ill. 2d 162, 263 N.E.2d 89). In *Swain*, the court concluded that a deliberate attempt by the State to exclude blacks from jury participation is impermissible, but required the defendant to establish a prima facie case of purposeful exclusion in order to invoke protection of the fourteenth amendment to the United States Constitution.

Defendants cite the recent case of *People v. Wheeler* (1978), 22 Cal. 3d 258, 583 P.2d 748, 148 Cal. Rptr. 890, which challenges *Swain*. In *Wheeler*, as here, there were two black defendants. They were accused of murder of a white male. The final jury consisted of 12 white males. Seven blacks were dismissed by the prosecution. We follow the line of reasoning advanced in *Wheeler*, where the court said:

> "Under *Swain* a defendant is barred from vindicating his right to an impartial jury unless he can prove that over a long period of time the same prosecutor has struck every black from every petit jury 'whatever the circumstances, whatever the crime and whoever the defendant or the victim may be.'
>
> To begin with, *Swain* obviously furnishes no protection whatever to the first defendant who suffers such discrimination in any given court—or indeed to all his successors, until 'enough' such instances have accumulated to show a pattern of prosecutorial abuse. * * * [E]ach and every defendant—not merely the last in this artificial sequence—is constitutionally entitled to trial by a jury drawn from a representative cross-section of the community. [See *Taylor v. Louisiana* (1975), 419 U.S. 522, 42 L. Ed. 2d 690, 95 S. Ct. 692, where the United States Supreme Court held the selection of a petit jury from a representative cross-section of the community is an essential component of the sixth amendment right to a jury trial.]
>
> Moreover, even if we consider only the defendant who believes himself in a position to invoke the exception suggested in *Swain*, we see that his attempt to comply with the federal standard of proof is bound to fail. The defendant is party to only one criminal proceeding, and has no personal experience of racial discrimination in the other trials held in that court. Nor can he easily obtain such information, for several reasons. First, those defendants who are indigent or of limited means cannot afford to pay investigators to develop the necessary data. Second, even if the funds were available—or the public defender's office were willing and able to do the research—the time is not: by definition, abuse of peremp-

tory challenges does not appear until the jury selection process is well under way—as in the case at bar—and few if any trial judges would be willing to interrupt the proceedings at that point by a continuance of unpredictable length to permit the necessary investigation. Third, even if the funds and time were available, the data is not: we know of no central register conveniently listing the names and races of all jurors peremptorily challenged by the prosecution in a given court." *Wheeler*, 22 Cal. 3d 258, 285-86, 583 P.2d 748, 767-68, 148 Cal. Rptr. 890, 908-09.

■■ We deem it the responsibility of the trial court, in instances such as this, to determine whether the State properly exercised its peremptory challenges. The record indicates that before defense counsel made a motion for mistrial the State used seven challenges—four against black persons. This indicates to us that further inquiry by the trial court would have been appropriate. The trial court's statement to the effect that there was no law regarding race or nationality and the selection of jurors was an inadequate response to the motion.

The court, in *Wheeler*, further says:

"In *Glasser v. United States* (1942), 315 U.S. 60, [86 L. Ed. 680, 62 S. Ct. 457], the defendants in a federal trial complained of the alleged exclusion from petit jury service of all women not members of the state League of Women Voters. Although rejecting the contention on the ground of insufficient proof, the high court strongly reaffirmed the requirement of a representative jury. It observed at the outset that impartiality achieved through representativeness is essential to preserving the constitutional right to jury trial: 'Lest the right of trial by jury be nullified by the improper constitution of juries, the notion of what a proper jury is has become inextricably intertwined with the idea of jury trial.' (*Id.*, at p. 85 [86 L. Ed. at p. 707].) Quoting from *Smith v. Texas*, the court stated (at p. 86, [86 L. Ed. at p. 707]) that 'the proper functioning of the jury system, and, indeed, our democracy itself, requires that the jury be a "body truly representative of the community," and not the organ of any special group or class.' Finally, the court warned (ibid; [86 L. Ed. at p. 707]) that the officials charged with choosing jurors 'must not allow the desire for competent jurors to lead them into selections which do not comport with the concept of the jury as a cross-section of the community. Tendencies, no matter how slight, toward the selection of jurors by any method other than a process which will insure a trial by a representative group are undermining processes weakening the institution of jury trial, and should be sturdily resisted. That the motives influencing such tendencies may be of the best must not blind us to the dangers

of allowing any encroachment whatsoever on this essential right.'" *People v. Wheeler* (1978), 22 Cal. 3d 258, 267-68, 583 P.2d 748, 755, 148 Cal. Rptr. 890, 896-97.

We abhor and condemn the practice of the use of the peremptory challenge to strike all blacks from a jury. The injury is not limited to the defendant; there is injury to the jury system, to the community at large, and to the democratic process reflected in our courts. However, the evidence of purposeful exclusion in the case at bar is not as apparent as in *Wheeler*; therefore, we do not reverse. In a proper case we would not hesitate to reverse and remand where purposeful exclusion has been shown.

We have carefully reviewed other issues raised by the defendants and find them not to be dispositive of this appeal.

For the aforesaid reasons, the judgment of the circuit court with respect to the aggravated kidnapping charge is reversed. We reverse the court's order vacating the charge of robbery and affirm the jury's finding of guilty as to robbery, and remand this cause to the circuit court for sentencing on the robbery conviction.

Reversed, with judgment here, and remanded, with directions.

JIGANTI and ROMITI, JJ., concur.