2025 IL App (1st) 231763-U

No. 1-23-1763

THIRD DIVISION
June 4, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 20 CR 05211 |
| | ) | |
| DANTE JEFFRIES, | ) | Honorable |
| | ) | William G. Gamboney, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE D.B. WALKER delivered the judgment of the court.
Justice Reyes and Justice Martin concurred in the judgment.

**ORDER**

¶ 1  *Held*: Defendant's convictions are affirmed where the evidence was sufficient to establish that he moved an officer with the intent to secretly confine him, and that the officers he battered suffered great bodily harm. Defendant's sentence is also affirmed where his waiver of counsel prior to sentencing was valid, and the trial court did not improperly consider a factor inherent in each offense in aggravation.

¶ 2  Defendant Dante Jeffries appeals his conviction after a bench trial of aggravated kidnapping, aggravated battery, and resisting or obstructing a correctional officer. He also appeals his concurrent sentence of 22 years in prison for aggravated kidnapping and 14 years each for his

two aggravated battery convictions. On appeal, defendant contends the State failed to prove beyond a reasonable doubt that (1) he kidnapped Officer Ambrosia where the officer's asportation and confinement were incidental to another offense and there was no intent to secretly confine him, and (2) he committed aggravated battery against Officers Ambrosia and Scaccianoce where they did not suffer great bodily harm. Defendant also contends that his waiver of counsel prior to sentencing was invalid where the trial court failed to advise him that he faced a mandatory supervised release (MSR) term of three years. Finally, defendant contends that the trial court improperly considered great bodily harm, a factor inherent in each offense, as an aggravating factor when sentencing him. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Following an incident at the Cook County Jail on April 14, 2020, defendant was charged, along with co-defendant Sharelle Sims, with attempted murder, aggravated kidnapping, aggravated battery, obstruction of a correctional officer, and possession of contraband in a penal institution. Prior to defendant's bench trial, the State dismissed the contraband charge.

¶ 5     At trial, Cook County Sheriff Officer Shawn Manis testified that he was a special investigator who watched live camera feeds showing the interior of the Cook County Jail. He testified that his primary objective while monitoring was "to ensure that each officer that was assigned to the tier was maintaining their 30-minute security checks, as well as to provide general security observation throughout the division."

¶ 6     On April 14, 2020, around 3:30 a.m., Officer Manis was monitoring the camera feeds for Tier 1A when he observed Officer Charles Ambrosia let defendant out of his cell. Officer Manis testified that he paid "extra attention" to the monitor when an officer on the midnight shift opened cell doors. Therefore, he "had the cameras [in that area] blown up" for better observation. Officer

Manis saw defendant "getting water from the water fountain and then returning to a cell." Defendant appeared to retrieve something behind the opened cell door before standing up to grab Officer Ambrosia. As they struggled, Officer Manis phoned the shift commander to notify him of the incident.

¶ 7    Officer Manis then observed defendant and Sims pull Officer Ambrosia into a cell and close the door. He again notified his shift commander and informed him of the specific cell where Officer Ambrosia was located. Other correctional officers came to assist Officer Ambrosia. At that time, Officer Ambrosia had managed to make his way out of the cell. Officer William Watt approached defendant, who was on top of Officer Ambrosia. Sims had managed to open a second cell door and was attempting to open other doors with keys taken from Officer Ambrosia. Officer Vincent Scaccianoce tried to return the inmates to their cells at which point defendant struck Officer Scaccianoce "one time across the face and [Scaccianoce] fell straight down. It was obvious from the video *** that he was unconscious at the time, he just fell straight down to the ground." As Officer Watt attempted to confront defendant, defendant struck him and Officer Watt "fell backwards" and hit his head against the wall.

¶ 8    Officer Manis notified other shift commanders of the ongoing incident, and shortly thereafter, additional staff arrived at the tier. Officer Manis observed Sergeant Ciukaj withdraw his Taser, pointing the laser lights at defendant and Sims. Sergeant Ciukaj ordered them to return to their cell as other officers attempted to secure the other cell doors.

¶ 9    On cross-examination, Officer Manis acknowledged that there was no audio on the recording. He testified that he was watching two 30-inch computer monitors, and "[e]ach monitor had 12 camera angles on it." Therefore, he was "watching 24 camera angles at once." Officer Manis also acknowledged that while he made phone calls to the shift commanders, he had to "take

[his] eyes off the screens." He testified that the phones "were situated directly next to our computer monitors," but when he was making the calls he was not looking at the screen.

¶ 10    Officer Manis testified that after an incident, the video from the camera is preserved and stored. He had an opportunity to view the video recording of the incident, and it accurately portrayed what he had observed on the monitor on April 14, 2020. The video recording was admitted into evidence without objection and published to the court.

¶ 11    The video showed Officer Ambrosia on the upper level of the cell complex making deliveries to the inmates. All of the cell doors had only one small rectangular window near the top. If the door was closed, a person observing from the exterior could not see the interior of the cell. After Officer Ambrosia opened the door to defendant's cell, defendant exited and they had a discussion. The officer then handed defendant an object and defendant ran downstairs. Officer Ambrosia continued his delivery to the inmates.

¶ 12    When defendant returned to his cell, Officer Ambrosia was standing next to the open door. Defendant then placed an object on the floor and grabbed Officer Ambrosia from behind. They struggled with one another as defendant attempted to drag Officer Ambrosia into the opened cell. Defendant's cellmate, Sims, then exited the cell. He and defendant successfully dragged a struggling Officer Ambrosia into the cell, and they closed the door. The door remained closed for approximately 20 seconds. During that time, the door opened revealing their continued struggle with Officer Ambrosia. Sims immediately closed the door.

¶ 13    Officer Ambrosia eventually managed to open the door and run onto the walkway in front of the cells. Defendant immediately followed. Officer Ambrosia fell to the ground and defendant punched him in the head with his fist. Defendant then kneeled over Officer Ambrosia, who was on his stomach on the ground. Defendant held his arm around Officer Ambrosia's neck for

approximately 12 seconds. When defendant stood up, Officer Ambrosia was motionless for more than 10 seconds. As defendant was choking Officer Ambrosia, Sims used keys to open the cell door next to them.

¶ 14 Officer Watt appeared and ran up the stairs to the upper level. When Officer Ambrosia tried to get up, defendant again held his arm against the officer's neck. He released his hold when Officer Watt approached them. As Officer Watt attended to Officer Ambrosia, who was able to stand, Officer Scaccianoce appeared on the screen. He ran up the stairs to confront defendant. Defendant then punched Officer Scaccianoce in the head with his fist and the officer immediately fell to the ground, motionless. Officer Watt then said something to defendant and defendant punched him in the head with his fist. Officer Watt fell back against the wall and lay motionless on the ground. At this point, only Officer Ambrosia remained standing.

¶ 15 Another officer appeared on screen and defendant ran down the stairs to confront him. He swung his fist at that officer's head, but it cannot be discerned from the video whether he made contact. Sims again used the keys to unlock another cell door. Other officers arrived and what is depicted on the video thereafter followed Officer Manis' testimony.

¶ 16 At trial, Officer Ambrosia testified that around 3:30 a.m. on April 14, 2020, he was delivering breakfast trays to Division 9. When he unlocked defendant's cell door, defendant asked for water because the sink in their cell was broken. After confirming that the sink was broken, Officer Ambrosia allowed defendant to get water from the water fountain. As he waited for defendant to return, he was hit from behind. He next recalled that he was in the jail's medical unit. He testified that he was familiar with Division 9 and knew that cameras would record everything that occurred.

¶ 17    Officer Ambrosia was transported to Mount Sinai Hospital. He reported pain in his neck and back. On follow-up visits with his physician after the incident, Officer Ambrosia discovered that he had two compressed discs in his back causing numbness in his right arm and leg. Ten months later, he had surgery to replace the discs. He testified that he now uses a cane to walk. On cross-examination, Officer Ambrosia acknowledged that he had sought treatment for neck issues before the incident. He stated that he had a sore neck before, "but never to the point of any kind of issue like this." Four pictures of his injuries were admitted into evidence. They showed him in a neck brace with a red mark above his eye, a red mark on his neck, and scrapes to his leg and knee.

¶ 18    Officer Watt testified that on April 14, 2020, he was working the night shift in Division 9. Around 3:30 a.m., he heard screaming. He looked at the camera and observed a cell door opened with the lights on inside. Officer Watt ran to the tier where he saw Officer Ambrosia with two inmates on the top deck. Officer Ambrosia "was on his knees screaming and [Officer Watt had] never witnessed anything like this." He asked the inmates whether Officer Ambrosia was having a seizure. He tried speaking with Officer Ambrosia, but "[a]ll he could do was scream."

¶ 19    Officer Watt observed Officer Scaccianoce running up the stairs. When Officer Scaccianoce approached the inmates, he "hit the floor." Officer Watt realized that they were under attack and he "kind of froze in place." Officer Watt was then struck, but he did not know who hit him. He remembered being placed in an ambulance and being at the hospital. He had suffered a fractured skull above his right temple, bleeding on the brain, and whiplash. He also has long-term hearing damage to his right ear. He has not returned to work.

¶ 20    Officer Scaccianoce testified that on April 14, 2020, around 3:30 a.m., he was delivering breakfast trays on Tier1D. He then heard a radio transmission relating to Tier 1A. When he got there, he observed two open cell doors on the upper deck, an officer on the ground, and inmates

out of their cells. Officer Scaccianoce ran up the stairs and placed himself between the inmates and Officer Ambrosia. Officer Ambrosia tried to say something but he "wasn't making sense."

¶ 21     As Officer Scaccianoce tried to return the inmates to their cells, defendant struck him in the head. He testified that after being struck, he became unconscious and fell on his back. He recalled being escorted down the stairs by another officer. Officer Scaccianoce suffered a cut on the back of his head. He was transported to Mount Sinai Hospital and treated for his injuries. He received two or three staples to close the cut. He testified that he had viewed the video recording of the incident and identified himself in the video. He knew that "[t]he actions on all the tiers are constantly being recorded."

¶ 22     Dr. Monika Pitzele testified that on the morning of April 14, 2020, she treated three correctional officers. Officer Watt reported that he had been struck in the face and lost consciousness. A CT scan showed an epidural hematoma, or bleeding on the brain, and a skull fracture on the right side. The bleeding on his brain indicated a "significant head injury caused by [a] hit from one side that causes a skull fracture and underlying bleed and enough force that shakes the brain inside the skull causing injury to the other side."

¶ 23     Dr. Pitzele testified that Officer Ambrosia reported he had been hit in the face and lost consciousness. Although he had jaw pain, and visible abrasions to his forehead and back, imaging showed no brain or spinal injuries. On cross-examination, she testified that Officer Ambrosia's larynx was not damaged, and there was no swelling in his neck. On redirect examination, Dr. Pitzele agreed that even if no further treatment was required in the emergency room, follow-up care may be required to fully address Officer Ambrosia's injuries.

¶ 24     Officer Scaccianoce reported to Dr. Pitzele that he was hit on the head, but he denied losing consciousness. An examination revealed a hematoma, or collection of blood, on the right side of

his skull. There was also a two-centimeter laceration. She testified that since Officer Scaccianoce's laceration was on his head, they stapled his wound. He received three staples.

¶ 25　The State rested and defendant moved for a directed verdict on the attempted murder and aggravated kidnapping counts. The trial court denied the motion.

¶ 26　Defendant testified in his defense. He testified that the day before the incident, he had taken Effexor, which is an anti-depressant. The medication was prescribed to his cellmate. Around 3:30 a.m. on April 14, 2020, defendant was awake and writing letters. He used a "wick" as a light source. Defendant stated that he was also "working out." After he finished, he "washed up" and started reading a men's health book. When he saw a shadow outside his cell door, he put out the light because he did not want to get into trouble. He smoked a coffee cigarette and the door to his cell flew open. Defendant saw Officer Ambrosia at the door.

¶ 27　Defendant testified that Officer Ambrosia made derogatory comments and asked defendant to step outside. Defendant's head "got tight" and his legs felt heavy. He began to vomit. Defendant testified that he next remembered being "in the bullpen cuffed up" and the nurses asking him what had happened. He did not remember leaving his cell or going downstairs to get water. He did not remember striking or choking Officer Ambrosia or striking the other officers.

¶ 28　On cross-examination, defendant stated that he was six-feet-two-inches tall and at the time of the incident, he weighed about 240 pounds. He acknowledged that in April of 2020, he was working out and "keeping fit." Defendant spent 15 or 16 months in segregation after the incident. He did not remember what happened that night because the coffee cigarette he smoked contained PCP. He discovered this after his segregation period when the person who gave him the cigarette said that defendant got "the wrong coffee square."

¶ 29    The defense introduced a stipulation regarding additional testimony from Dr. Pitzele. If recalled to testify, she would state that the imaging of Officer Ambrosia showed "mild degenerative disc changes," mild irregularities of the vertebral endplate, and a "developmental incomplete fusion." She found "[n]o abnormal prevertebral soft tissue swelling or asymmetry."

¶ 30    The defense rested and the parties presented their closing arguments.

¶ 31    The trial court found defendant not guilty of attempted murder (count 1). However, it found defendant guilty of aggravated kidnapping of Officer Ambrosia (count 2), aggravated battery of Ambrosia (count 3), aggravated battery of Officer Watt (count 4), aggravated battery of Officer Scaccianoce (count 5), and resisting or obstructing each of the officers (counts 6-8). The trial court found the officers' testimony credible "in just about every aspect." The court then addressed the issue of great bodily harm. The court found that "all three officers at one point or another had lost consciousness, flat out not moving on the ground." That finding alone "would be evidence of great bodily harm."

¶ 32    The court acknowledged that great bodily harm is of a more serious nature than simple battery. It noted that loss of consciousness and the inability to recall events are common features of a person who is seriously battered as these officers had been during the altercation. The court referred to Officer Ambrosia "screaming at the top of his lungs" and "talking nonsense," and that these actions showed the officer had suffered great bodily harm. The trial court also mentioned defendant's size and that he "works out on a regular basis." The video showed defendant

> "tossing around Ambrosia like a rag doll. It show[ed] him knocking out Scaccianoce and Watt with one single punch. And it wasn't like they were sent reeling into an eight count. They went down like a sack of potatoes to the floor unconscious. That, in the Court's view, is great bodily harm."

¶ 33    The trial court also found that by dragging Officer Ambrosia into the cell, defendant "was hiding what he was doing and whatever it was, it couldn't have been for any good purpose." The court did not find defendant's testimony credible. The court found it "preposterous" that Officer Ambrosia, given his size, would provoke defendant and challenge him to a fight.

¶ 34    Defendant filed a motion for a new trial. Therein, he argued that the trial court's findings were against the manifest weight of the evidence and the State failed to prove him guilty beyond a reasonable doubt of the offenses. Specifically, defendant contended that the injuries suffered by Officers Ambrosia and Scaccianoce did not constitute great bodily harm. The trial court denied the motion, finding that when "a person is beaten and/or choked to the extent that they lost consciousness for a period of time, that's great bodily harm."

¶ 35    On May 11, 2023, the day of defendant's scheduled sentencing hearing, defense counsel informed the court that he had spoken with defendant that morning and they reviewed the presentence investigation report in preparation for sentencing. Counsel was later informed by sheriffs that defendant "had apparently passed out cold and was laying on the floor of his cell." Defendant had been taken to the hospital for an evaluation and therefore was not present in court. The trial court set May 22, 2023 as the date "for status on sentencing in person."

¶ 36    On May 22, 2023, the sheriff informed the court that defendant was in the building but was "not responding. He's got a pulse and he's breathing, but he is not responding." The trial court noted that a similar incident occurred on May 11, 2023. The court stated that "[defendant] was here and apparently had similar type reactions and then *** he was taken to the hospital." However, defendant had been discharged that same day. The court expressed concern that defendant's conduct may be "another scam that he seems to have previously tried to foist on the Court." The court directed the sheriff to get medical attention for defendant "in the event that there

is some real medical emergency," and ordered that the court be provided with the sheriff's report and medical reports on June 15, 2023, the next court date.

¶ 37 On June 15, 2023, the sheriff informed the trial court that defendant had passed out again and was taken to a hospital. The court stated that "this appears to be a continuing situation. It has all the earmarks of him pretending he is passing out or whatever." The court set July 6, 2023 as the next court date. On that date, defendant appeared by Zoom. He requested that the court reconsider his claims regarding ineffective assistance of counsel. Defendant wanted the court to tell defense counsel to visit him so he could "give him character witnesses." The trial court also received defendant's medical records indicating that doctors were unable to find any diagnosis that would have caused defendant to pass out. The court stated that it suspected defendant was "just malingering to put sentencing off." Defendant's sentencing date was subsequently moved to August 29, 2023. Prior to sentencing, defendant filed a *pro se* motion for substitution of judge which was denied.

¶ 38 At the sentencing hearing, the trial court addressed defendant's request to represent himself. After defendant confirmed that he wished to represent himself, the court advised him that the "top charge is an aggravated kidnapping. That is a class X offense punishable by a minimum of 6 years and the maximum would be 30 years in the Illinois Department of Corrections." The court also advised defendant that he "would have to serve a period of 18 months of mandatory supervised release." The State clarified that he would serve 85 percent of his sentence.

¶ 39 The trial court questioned defendant about his level of education and his knowledge of the law. Defendant stated that his highest level of education was 11th grade and that he had represented himself for "a short period of time" in another case. He understood that he would not receive special consideration from the judge, nor would he have special privileges in the law library. When

the trial court asked if he was sure he wanted to represent himself in the matter, defendant answered, "Yes." The court allowed the public defender to withdraw. The trial court then denied defendant's *pro se* motions alleging ineffective assistance of counsel.

¶ 40     In sentencing defendant, the trial court found, as an aggravating factor, that "defendant's conduct caused or threatened serious harm." It also noted defendant's prior delinquency or criminal activity and found that his sentence was "necessary to deter others from committing the same crime." Defendant was 33 years old and had a criminal background "dating back to Juvenile Court." He had "a number of felony convictions." Defendant also had "a federal case where he received 100 months in prison."

¶ 41     The trial court considered the statutory mitigating factors. It noted defendant's statement that he suffered from physical and emotional abuse as a child and that he ran away from home to escape the abuse. Defendant also stated that he has two children and cared for them with earnings from gambling. He admitted to an alcohol problem but has received treatment while incarcerated.

¶ 42     Defendant told the court that he wanted to present character witnesses who would "testify to say what type of person I am inside the jail." However, he would not give the court names of the witnesses, and he did not know specifically what they would say about him. Defendant stated only that they would say he was "not problematic." The court denied his request, finding that it could not "take that as evidence" where defendant "[did not] know what they're going to say." When the trial court told defendant to "tell me what you want to tell me before I impose sentence on your case," defendant responded, "Go ahead and impose my sentence."

¶ 43     The trial court found that "[t]his certainly is a serious case," and defendant's behavior was "egregious." Defendant "inflicted profound lasting injuries to three blameless victims just doing their jobs." The court did not know whether defendant deserved the maximum sentence, but it

found that he "certainly has earned more than a minimum sentence." Defendant was sentenced to 22 years in prison on count 2, with count 3 merging into count 2. On counts 4 and 5, the court sentenced defendant to 14 years in prison for each count, to be served concurrently with his 22-year sentence. The court found that "count 6 merges into count 2. Count 7 merges into count 4. Count 8 merges into count 5."

¶ 44    Defendant filed a motion for a new trial and the public defender's office filed a motion for reappointment of counsel. After reappointing the public defender, the trial court ruled on defendant's motion to reconsider his sentence. The trial court denied the motion, noting that it had "spent a lot of time on this and listened attentively to the arguments of counsel and the filings that were presented." The court found that the sentence was "mid range or maybe a little above the mid range and given [defendant's] involvement in these issues of which he was convicted, I think that was a fair and equitable sentence."

¶ 45    Defendant filed this appeal.

¶ 46                                    II. ANALYSIS

A. *Sufficiency of the Evidence - Kidnapping*

¶ 47    Defendant first contends that the evidence at trial was insufficient to convict him of the aggravated kidnapping of Officer Ambrosia and aggravated battery against Officers Ambrosia and Scaccianoce. On a claim of insufficient evidence, we determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Harris*, 2018 IL 121932, ¶ 26. In a bench trial, it is the trial judge's responsibility to weigh the evidence, resolve conflicts in the testimony, and draw reasonable inferences from the facts. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). In doing so, the factfinder need not disregard inferences that flow normally

from the evidence, nor seek all possible explanations consistent with innocence and elevate them to reasonable doubt. *People v. Newton*, 2018 IL 122958, ¶ 24. We will reverse a conviction only if the evidence is so unreasonable, improbable, or unsatisfactory that there exists a reasonable doubt of defendant's guilt. *Harris*, 2018 IL 121932, ¶ 26.

¶ 48 Defendant contends that the evidence was insufficient to convict him of aggravated kidnapping where there was no evidence that a kidnapping occurred. Defendant argues that the asportation of Officer Ambrosia into the cell, and his confinement, were merely incidental to the battery and robbery committed against him.

¶ 49 Relevant here, section 10-1 of the Criminal Code of 2012 (Code) (720 ILCS 5/10-1(a)(2) (West 2022)) provides that "[a] person commits the offense of kidnapping when he or she knowingly [ ] *** by force or threat of imminent force carries another from one place to another with intent secretly to confine that other person against his or her will[.]" However, our courts have recognized the inequity inherent in upholding kidnapping convictions where the asportation or detention of the victim was merely incidental to another offense. See *People v. Smith*, 91 Ill. App. 3d 523, 528 (1980). Factors to consider when determining whether an asportation or detention is merely ancillary to another offense include:

"(1) the duration of the asportation or detention; (2) whether the asportation or detention occurred during the commission of a separate offense; (3) whether the asportation or detention is inherent in the separate offense; and (4) whether the asportation or detention created a significant danger to the victim independent of that posed by the separate offense." *Siguenza-Brito*, 235 Ill. 2d at 225-26.

¶ 50     To support his contention that Officer Ambrosia's asportation was merely incidental to the battery and robbery that occurred, defendant cites *People v. Smith*, 91 Ill. App. 3d 523 (1980), *People v. West*, 2019 IL App (1st) 162400, and *People v. Short*, 2020 IL App (1st) 162168.

¶ 51     In *Smith*, the victim was waiting in a parked car as his girlfriend retrieved a document from her apartment. *Smith*, 91 Ill. App. 3d at 525. The defendants, Smith and Lewis, approached the car and one of them knocked on the driver's side window. The victim opened the door slightly and the defendants forced their way into his car. Smith told the victim that they had just robbed a bank and needed a vehicle to escape the area. *Id*. As Smith drove the vehicle, the victim repeatedly asked to be released. The defendants asked the victim for all of his money, but he only had 60 cents. When they asked for his wallet and found it empty, they returned it to the victim. The victim testified that Lewis told him to write his name, address and telephone number on a piece of paper so the car could be returned to him. *Id*.

¶ 52     The vehicle pulled into a service station and the defendants warned the victim not to move. After obtaining gas, Smith drove from the station. He drove south on Clark Street and at the intersection of Clark and Addison, he stopped the car and let the victim exit. Lewis warned the victim not to contact the police, or he would never see his car again. The victim called the police and later identified the defendants in a lineup. *Id*. On cross-examination, the victim stated that he never saw the defendants with a weapon, and they returned the 60 cents he had given them, plus an additional five cents. *Id*.

¶ 53     The jury found the defendants guilty of aggravated kidnapping, robbery, and unlawful restraint. *Id*. at 526. On appeal, this court found that the victim's asportation was merely incidental to the commission of a felony where it "was only for a short period of time, occurred during the commission of a separate offense, and offered no significant danger to the victim independent of

that posed by the felony." *Id*. at 529. In relevant part, the court found the unlawful restraint charge to be "an acceptable alternative" to aggravated kidnapping and reversed the defendants' aggravated kidnapping conviction. *Id*.

¶ 54 In *West*, the victim was employed at a currency exchange in Chicago. *West*, 2019 IL App (1st) 162400, ¶ 3. While the victim was at work, the defendant entered through the ceiling. *Id*. He grabbed the victim and, holding a knife to her neck, he pulled her to the back of the exchange where the cash was located. When the victim refused to open the door, the defendant grabbed her keys and opened the door. He pushed the victim through the door and as she entered the back room, she quickly closed a gate that prevented him from accessing the area with the cash. The defendant opened the exit door, threw the keys on the floor and left the currency exchange. *Id*. He was apprehended by police about 25 minutes later. *Id*. ¶ 4.

¶ 55 The trial court found the defendant guilty of all charges, including aggravated kidnapping. *Id*. ¶ 8. In vacating the defendant's aggravated kidnapping conviction, this court found that the State failed to prove asportation where "[t]he movement took little time and did not significantly increase the dangers [the victim] faced as a victim of attempted armed robbery and aggravated battery." *Id*. ¶¶ 17-18.

¶ 56 Similarly, in *People v. Short*, 2020 IL App (1st) 162168, ¶ 89, this court found that the forced asportation of the victim to the back room of his office, where the proceeds were located, was ancillary to armed robbery and did not support a separate conviction for aggravated kidnapping. The victim was forced to remain in the room only for the time it took the co-defendant to open the safe and remove the property, and was left alone once the offenders took the property. *Id*. The victim was taken to the back room for the sole purpose of opening the safe located there.

*Id*. ¶ 90. As such, the court found that the asportation occurred during the commission of the robbery, a separate offense. *Id*. ¶ 89.

¶ 57 We find these cases distinguishable from the case before us. Like *Smith*, *West*, and *Short*, the forced asportation of the victim here was of very brief duration. However, it is well-established that a kidnapping conviction "is not precluded by the brevity of the asportation or the limited distance of the movement." *People v. Ware*, 323 Ill. App. 3d 47, 54 (2001). In *West* and *Short*, the asportation occurred during the course of an armed robbery where the offender needed the victim in a specific location in order to take the property. In *Smith*, the defendants took the victim's vehicle, with the victim inside, because they needed to escape after committing a bank robbery. The court in those cases thus found that the asportation of the victim was incidental to the robbery being committed. In contrast, dragging Officer Ambrosia into the cell was not necessary for defendant to commit battery or robbery against him. Moreover, had Officer Ambrosia been left in the closed cell injured and in need of medical treatment, there would be no question that the asportation created a significant danger to him independent of that posed by the separate offense of battery. His location behind a closed door would have delayed any assistance from other officers, even if they had known he was somewhere on the tier. Considering the four factors set forth in *Siguenza-Brito*, the asportation of Officer Ambrosia was not merely incidental to the battery and robbery committed against him.

¶ 58 Defendant argues that, regardless of whether the asportation element is satisfied, the State's evidence did not support a finding that he intended to secretly confine Officer Ambrosia.

¶ 59 "*Secret* confinement is a necessary element under the confinement theory of kidnapping." (Emphasis in the original.) *Siguenza-Brito*, 235 Ill. 2d at 227. Our supreme court has defined "secret" in this context as "concealed, hidden, or not made public." *People v. Gonzalez*, 239 Ill. 2d

471, 479 (2011). The secret confinement element may be shown either by evidence of the secrecy of the confinement or the secrecy of the location of the confinement. *Id*. As the supreme court in *Gonzalez* explained,

"[C]onfinement is secret where it 'serves to isolate or insulate the victim from meaningful contact or communication with the public, that is, when the confinement is in a place or in a manner which makes it unlikely that members of the public will know or learn of the victim's unwilling confinement within a reasonable time.' " *Id*. at 480, quoting 3 Wayne R. LaFave, Substantive Criminal Law §18.1(c), at 17 (2d ed. 2003).

Therefore, secret confinement can be established by evidence showing that the defendant isolated the victim from meaningful contact with the public. *Id*.

¶ 60    The pertinent issue here is not whether defendant secretly confined Officer Ambrosia, but whether the circumstances were sufficient to prove beyond a reasonable doubt that he acted with the *intent* to secretly confine Officer Ambrosia. See *People v. Calderon*, 393 Ill. App. 3d 1, 7-8 (2009). When a defendant denies intent, the State may prove his intent through circumstantial evidence. *People v. Phillips*, 392 Ill. App. 3d 243, 259 (2009); see also *People v. Johnson*, 28 Ill. 2d 441, 443 (1963) (finding that "[i]ntent must ordinarily be proved circumstantially, by inferences drawn from conduct appraised in its factual environment"). Whether circumstantial evidence supports the requisite intent to prove kidnapping is generally a question of fact for the factfinder. *Calderon*, 393 Ill. App. 3d at 7.

¶ 61    Defendant argues that he could not have intended to secretly confine Officer Ambrosia where the tier was under camera surveillance, and the officers testified that they knew the incident was being recorded when it occurred. While Officer Manis was observing the incident as it occurred and was thus aware that Officer Ambrosia was being confined in a particular cell, we

- 18 -

focus our inquiry on *defendant's* intent as he dragged the officer into the cell. Intent may be inferred from defendant's conduct surrounding the act, as well as from the act itself. *People v. Phillips*, 392 Ill. App. 3d 243, 259 (2009).

¶ 62    When Officer Ambrosia was inside the cell with the door closed, he clearly had been confined since he was enclosed within a structure. *People v. Banks*, 344 Ill. App. 3d 590, 593 (2003). Furthermore, the video showed that defendant and Sims intentionally closed the cell door after dragging the officer inside, then immediately closed it again when the door pushed open as Officer Ambrosia struggled against his confinement. From these actions, a factfinder could reasonably infer that defendant intended to keep Officer Ambrosia's location hidden from the other officers on duty that night, at least for the time being. If Officer Manis had not noticed Officer Ambrosia on the monitor, which is entirely possible given that he was "watching 24 camera angles at once" on two computer screens, he would not have known anything was amiss if he then looked at defendant's cell with the door closed. Even if he knew Officer Ambrosia was somewhere on that tier, he could have believed that Officer Ambrosia left to attend to another concern. From defendant's point of view, closing the door served to keep a potentially precarious situation hidden from those who would come to Officer Ambrosia's aid. We find that he had an intent to secretly confine Officer Ambrosia where it was done in a manner that isolated the officer from meaningful contact with the public, thereby making it unlikely that the public would discover his unwilling confinement within a reasonable period of time. See *Gonzalez*, 239 Ill. 2d at 480.

¶ 63    The fact that the secret confinement lasted only 20 seconds, because Officer Ambrosia managed to escape from the cell, did not detract from its secret nature or defendant's intent in confining the officer. See *e.g. Banks*, 344 Ill. App. 3d at 594 (finding an intent to secretly confine the victim where the defendant grabbed and dragged the victim down an alley towards a garage,

but the actual confinement was interrupted by an acquaintance of the victim). Viewing the evidence in the light most favorable to the prosecution, as we must, we find that it was sufficient to support defendant's aggravated kidnapping conviction where defendant dragged Officer Ambrosia into the cell and closed the door with the intent to secretly confine him.

B. *Sufficiency of the Evidence – Great Bodily Harm*

¶ 64     Defendant next contends that the evidence was insufficient to show that he committed aggravated kidnapping regarding Officer Ambrosia, and aggravated battery against Officers Ambrosia and Scaccianoce, where they did not suffer great bodily harm.

¶ 65     In general, bodily harm requires some type of physical pain or damage to the body, such as lacerations, bruises or abrasions, whether temporary or permanent. *People v. Johnson*, 2015 IL App (1st) 123249, ¶ 31. While courts agree that "great bodily harm" entails something more than the bodily harm required for simple battery, (see *e.g.*, *People v. Figures*, 216 Ill. App. 3d 398, 401 (1991) and *People v. Axtell*, 2017 IL App (2d) 150518, ¶ 64), there is little consensus on the degree of bodily harm necessary to rise to the level of "great bodily harm." Rather, this determination rests largely on the specific facts of the case. Whether defendant's actions caused "great bodily harm" to support a charge of aggravated battery is a question of fact for the factfinder. *People v. Crespo*, 203 Ill. 2d 335, 344 (2001), *as modified on denial of reh'g* (Mar. 31, 2003). In making this determination, the factfinder may consider direct evidence of harm or may infer harm based on "circumstantial evidence in light of common experience." See *People v. Bishop*, 218 Ill. 2d 232, 250 (2006).

¶ 66     Defendant argues that he did not inflict great bodily harm upon Officer Ambrosia or Officer Scaccianoce where neither suffered injuries that required hospitalization, and their abrasions and lacerations were easily treated. The issue, however, does not concern what treatment the victim

received but the harm he suffered. *People v. Costello*, 95 Ill. App. 3d 680, 684 (1981). A physical beating may be considered conduct that could cause great bodily harm. *Id.*

¶ 67    Video evidence presented at trial showed that after Officer Ambrosia fell to the ground, defendant punched him in the head with his fist. Defendant then kneeled over him and held his arm around the officer's neck for approximately 12 seconds. When defendant stood up, Officer Ambrosia was motionless for more than 10 seconds. Officer Ambrosia testified that he lost consciousness, and he next remembered being in the jail's medical unit. Officer Watt testified that when he got to Officer Ambrosia, he was on his knees and screaming. Officer Watt thought he was having a seizure.

¶ 68    Although there is no *per se* rule that loss of consciousness indicates the infliction of great bodily harm, loss of consciousness combined with the infliction of other injuries can certainly support such a finding. Here, a factfinder could reasonably infer based on common experience and knowledge that Officer Ambrosia felt physical pain while being choked. *People v. Johnson*, 2015 IL App (1st) 123249, ¶ 32. A factfinder could also infer, based on Officer Watt's testimony, that Officer Ambrosia suffered from serious pain because he was screaming and acting as if he was having a seizure. This conclusion is further underscored by the fact that defendant choked Officer Ambrosia long enough to cause him to lose consciousness for a short period of time. Accordingly, a factfinder could reasonably find that defendant inflicted great bodily harm when he forcefully held his arm against Officer Ambrosia's throat, thereby preventing the officer from breathing to the point he lost consciousness.

¶ 69    The evidence also showed that Officer Scaccianoce lost consciousness after defendant struck him in the head. Although Dr. Pitzele testified that the officer told medical personnel he did not lose consciousness, other evidence pointed to the contrary. Officer Manis testified that he

observed defendant strike Officer Scaccianoce "one time across the face and [Scaccianoce] fell straight down. It was obvious *** that he was unconscious at the time, he just fell straight down to the ground." Officer Scaccianoce testified at trial that after defendant struck him in the head, he became unconscious. He next recalled being escorted down the stairs by another officer. The trial court credited this testimony, finding that Officer Scaccianoce "went down like a sack of potatoes to the floor unconscious" after being struck by defendant. The court also noted defendant's size and the fact that he "works out on a regular basis." Officer Scaccianoce suffered a laceration to his head that required three staples to close, and a hematoma, or collection of blood, on the right side of his skull. Forceful blows to the head that do not cause significant external injury can be considered infliction of great bodily harm. See *People v. Matthews*, 126 Ill. App. 3d 710, 714-15 (1984) (although the victim testified she only suffered a bruise on her head, the court found that defendant's action striking the victim three times about her head and arms with a bat caused great bodily harm).

¶ 70    The cases cited by defendant, *Figures* and *People v. Steele*, 2014 IL App (1st) 121452, did not involve conduct by the defendant that caused the victim to lose consciousness. The victims in those cases also were not choked or intentionally punched in the head with such force that they lost consciousness. As a result, these cases are unpersuasive here. We find that the evidence was sufficient to support the trial court's determination that defendant inflicted great bodily harm upon Officers Ambrosia and Scaccianoce.

C. *Waiver of Counsel*

¶ 71    Defendant's third contention is that his waiver of counsel was invalid where the trial court incorrectly advised him that he was required to serve an MSR term of 18 months when he was actually required to serve 3 years of MSR.

- 22 -

¶ 72    The right of self-representation is "as basic and fundamental as [the] right to be represented by counsel." *People v. Nelson*, 47 Ill. 2d 570, 574 (1971). Therefore, a defendant may waive his constitutional right to counsel as long as the waiver is voluntary, knowing and intelligent. *People v. Haynes*, 174 Ill. 2d 204, 235 (1996). Supreme Court Rule 401(a) governs the trial court's acceptance of a defendant's waiver of counsel. Rule 401(a) requires the court to give certain admonishments before a defendant may be found to have knowingly and intelligently waived counsel. The rule provides, in relevant part, that the trial court must personally address defendant in open court, informing him of and ensuring that he understands "(1) the nature of the charge; (2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; and (3) that he has a right to counsel and, if he is indigent, to have counsel appointed for him by the court." Ill. S. Ct. R. 401(a) (eff. July 1, 1984).

¶ 73    Although compliance with Rule 401(a) is required for an effective waiver of counsel, our supreme court has also "recognized that strict, technical compliance with Rule 401(a) is not always required." *People v. Marcum*, 2024 IL 128687, ¶ 46. Substantial compliance is sufficient to effectuate a valid waiver if the record shows that defendant's waiver was made knowingly and voluntarily, and the admonishment he received did not prejudice his rights. *People v. Wright*, 2017 IL 119561, ¶ 41.

¶ 74    In *Wright*, the trial court had properly admonished the defendant in all respects except that it stated he faced a maximum sentence of 60 years in prison instead of the actual maximum term of 75 years. *Id*. ¶ 54. Our supreme court found that the record showed defendant's decision to waive counsel was freely, knowingly, and intelligently made. The trial court had thoroughly questioned him about his education and experience in legal proceedings, and he stated that he had

previously represented himself in a case. The court also informed the defendant of the potential pitfalls of representing himself. Nonetheless, the defendant repeatedly stated his desire to represent himself. *Id.* ¶ 55.

¶ 75 Our supreme court further found no basis to conclude that the defendant was prejudiced by the trial court's misstatement. *Id.* ¶ 56. He made no allegation that he would not have proceeded *pro se* if he had known of the proper maximum sentence. The court also noted that, although the defendant was eligible for a maximum 75-year sentence, the trial court imposed a 50-year sentence, which was less than the 60-year sentence it had stated in its admonishment. *Id.* The supreme court concluded that the trial court substantially complied with Rule 401(a), and the defendant made a voluntary, knowing, and intelligent waiver of counsel. *Id.* ¶ 57. See also *People v. Coleman*, 129 Ill. 2d 321, 338–39 (1989) (finding a valid waiver of counsel, even though the trial court misstated the minimum sentence applicable, where the defendant would have waived counsel regardless of the minimum sentence prescribed by law).

¶ 76 In this case, like *Wright*, the trial court questioned defendant about his education and his understanding of legal proceedings. Defendant stated that he had represented himself for "a short period of time" in another case. He also understood that he would not receive special consideration from the judge, nor would he have special privileges in the law library. Defendant repeatedly confirmed his desire to represent himself. We therefore find that defendant's decision to waive counsel was knowingly, intelligently, and freely made.

¶ 77 Moreover, the record did not indicate that defendant was prejudiced by the trial court's misstatement. He never alleged that he would have retained counsel had he known of the actual MSR term of three years. Rather, defendant's frustration with counsel's alleged failure to investigate his case indicated that he would have waived counsel regardless of the MSR term.

Additionally, the trial court properly informed defendant that the maximum sentence he would have to serve was 30 years in prison but then imposed a 22-year sentence. The trial court's misstatement did not prejudice defendant where it informed him that the maximum sentence he could receive was 30 years in prison followed by 18 months of MSR, and the actual sentence he received was 22 years in prison followed by 3 years of MSR. We find that defendant's waiver of counsel was valid, and the admonishment he received did not prejudice him.

### D. *Improper Sentence*

¶ 78 Defendant's final contention is that his 22-year sentence for aggravated kidnapping, and his concurrent 14-year sentences for aggravated battery, were improper where the trial court considered great bodily harm, a factor inherent in each offense, in aggravation.

¶ 79 The trial court is prohibited from considering an element inherent in the defendant's offense as an aggravating factor when imposing a harsher sentence than it might otherwise impose. *People v. Gonzalez*, 151 Ill. 2d 79, 83 (1992). Thus, if the infliction of serious harm is an element of the offense, it is improper for the trial court to consider, in aggravation, the mere fact that the defendant "indeed did cause serious harm to the victim." *People v. Joe*, 207 Ill. App. 3d 1079, 1085 (1991).

¶ 80 Our supreme court has recognized, however, that the commission of any offense "can have varying degrees of harm or threatened harm." *People v. Saldivar*, 113 Ill. 2d 256, 269 (1986). "[P]ublic policy demands that a defendant's sentence be varied in accordance with the particular circumstances of the criminal offense committed." *Id*. Therefore, the trial court may properly premise the severity of an imposed sentence on the degree of harm caused to the victim, "*even in cases where serious bodily harm is arguably implicit in the offense for which a defendant is convicted.*" (Emphasis in the original.) *Id*. If a thorough review of the trial court's remarks shows

that it considered the manner and circumstances of the infliction of bodily harm as aggravation, rather than the bare fact that serious harm was inflicted, the trial court committed no error in sentencing the defendant. *People v. Kibayasi*, 2013 IL App (1st) 112291, ¶¶ 57-58.

¶ 81 Here, the trial court reviewed the statutory aggravating factors in section 5-5-3.2(a) of the Code (730 ILCS 5/5-5-3.2(a) (West 2022)). It found that the first factor, that "defendant's conduct caused or threatened serious harm," applied. However, the trial court did not end there. After going through the aggravating and mitigating factors in the statute, the presentence investigation report, and defendant's background, the trial court determined that "[t]his certainly is a serious case." The court found defendant's behavior to be "egregious" where he "inflicted profound lasting injuries to three blameless victims just doing their jobs." A thorough review of the trial court's remarks at the sentencing hearing shows that the court properly considered the circumstances of the victims' injuries, and the manner in which they were inflicted, as an aggravating factor. Accordingly, we find no error in the imposition of defendant's sentence.

¶ 82                                          III. CONCLUSION

¶ 83 For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 84 Affirmed.